**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| John A. Olagues,<br><br>    *Plaintiff*,<br><br> v.<br><br>Stephen D. Steinour *et al*.,<br><br>    *Defendants.* | Case No. 17-cv-0049<br><br>Chief Judge Edmund A. Sargus<br><br>Magistrate Judge Elizabeth Preston Deavers |

**DECLARATION OF ROBERT W. TRAFFORD IN SUPPORT OF DEFENDANTS'
MOTION TO STRIKE PLAINTIFF'S PROCEDURALLY IMPROPER COMPLAINT**

I, Robert W. Trafford, hereby declare as follows under penalty of perjury:

1. I am an attorney at law licensed to practice in the State of Ohio.  I am associated with the Firm of Porter, Wright, Morris & Arthur, LLP, counsel for Defendants Huntington Bancshares Incorporated and Stephen D. Steinour ("Defendants") in this matter.  I submit this declaration in support of Defendants' Motion to Strike Plaintiff's Procedurally Improper Complaint.  By virtue of my representation of the Defendants in this matter, I have personal knowledge of the facts set forth below, and I could and would testify competently to those facts if called to do so.

2. Exhibit 1 is a true and correct copy of the July 5, 2016 Letter from John Olagues to Steve Steinour.

3. Exhibit 2 is a true and correct copy of the August 30, 2016 Letter from Stephen DiPrima to John Olagues.

4. Exhibit 3 is a true and correct copy of the September 23, 2016 Letter from John Olagues to Stephen DiPrima.

5. Exhibit 4 is a true and correct copy of the October 10, 2016 Letter from John Olagues to Stephen DiPrima.

6. Exhibit 5 is a true and correct copy of the November 3, 2016 Letter from Stephen DiPrima to John Olagues.

7. Exhibit 6 is a true and correct copy of the November 6, 2016 Letter from John Olagues to Stephen DiPrima.

8. Exhibit 7 is a true and correct copy of the December 5, 2016 Email from John Olagues to Stephen DiPrima.

9. Exhibit 8 is a true and correct copy of the December 27, 2016 Email from John Olagues to Stephen DiPrima.

10. Exhibit 9 is a true and correct copy of the January 2, 2017 Email from John Olagues to Stephen DiPrima.

11. Exhibit 10 is a true and correct copy of the February 13, 2014 Letter from John Olagues to James Dimon and Anthony Horan.

12. Exhibit 11 is a true and correct copy of the Email from John Olagues to Andrew Finn.

13. Exhibit 12 is a true and correct copy of the Stipulation of Voluntary Dismissal With Prejudice, *Olagues* v. *Dimon,* No. 14-CV-4872 (GHW) (S.D.N.Y. July 10, 2015).

14. Exhibit 13 is a true and correct copy of the Memorandum Opinion and Order, *Olagues* v. *Icahn,* 1:15-cv-0898-GHW (S.D.N.Y. March 23, 2016).

2

15.     Exhibit 14 is a true and correct copy of the Order Re: (1) Defendants' Demurrer and (2) Defendants' Motion for Determination that Plaintiff is a Vexatious Litigant, Order Requiring Security and Pre-filing Order, *Olagues* v. *Kousharian,* 4:14-cv-00818-JSW (Cal. Sup. Ct. January 12, 2006).

16.     Exhibit 15 is a true and correct copy of the Order, *Olagues* v. *Klien,* 2:09-cv-03092 (E.D. La. Sept. 28, 2009).

17.     Exhibit 16 is a true and correct copy of the Order and Reasons, 2:12-cv-02647 (E.D. La. Sept. 9, 2012).

18.     Exhibit 17 is a true and correct copy of the Order to Show Cause, *Olagues* v. *Dimon,* No. 14-CV-4872 (GHW) (S.D.N.Y. August 28, 2014).

I hereby declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

DATED this 29th day of March, 2017, at Columbus, Ohio.


_____/s/ Robert W. Trafford_____
Robert W. Trafford

# Exhibit 1

John Olagues
413 Sauve Rd
River Ridge LA 70123
504-305-4071
olagues@gmail.com

Stephen D. Steinour
Chairman and CEO
Huntington Bancshares Inc
HUNTINGTON CENTER
41 S. HIGH STREET
COLUMBUS, OH 43287

And

Richard A. Cheap
General Counsel
Huntington Bancshares Inc
HUNTINGTON CENTER
41 S. HIGH STREET
COLUMBUS, OH 43287

July 5, 2016

Dear Sirs:

This letter is a 60 day required notice under Section 16 b of the Securities Act of 1934 to
Huntington Bancshares to recover from Mr. Stephen D. Steinour $367,847 in profits that he
made by transactions in violation of 16 b of the 1934 Act . Attached is a listing of the
transactions he executed in making the profits.

You are requested within 60 days to request recovery of the profits from Mr. Steinour or if
necessary, to sue him to disgorge the profits. If your request is unsuccessful and you have
not filed suit, I, as a shareholder will file suit to recover profits on behalf of Huntington
Bancshares.

I will be happy to discuss this matter with you by email, letters or phone.

I have attached two documents which explain why the dispositions to Huntington
Bancshares are not exempt from 16 b.

Perhaps this matter can be settled prior to a suit by me .

Regards
John Olagues

1

**Huntington Bancshares**

**Stephen D. Steinour**

| Shares Purchased | Date | Price | Shares Disposed | Date | Price | Profit |
|---|---|---|---|---|---|---|
| 10,000 | 3/2/2016 | $9.27 | 10,000 | 11/6/2015 | $11.60 | $23,300 |
| 100,000 | 2/1/2016 | $8.57 | 100,000 | 11/6/2015 | $11.60 | $303,000 |
| 10,000 | 4/22/2015 | $10.79 | 10,000 | 6/22/2015 | $11.54 | $7500 |
| 9710 | 1/26/2015 | $10.17 | 9710 | 6/22/2015 | $11.54 | $13,302 |
| 13,496 | 10/21/2014 | $9.35 | 13,496 | 2/19/2015 | $10.64 | $17,409 |
| 2901 | 10/21/2014 | $9.35 | 2910 | 2/11/2015 | $10.50 | $3,336 |

Total profits............................ $367,847

2

Home | Archives | Products | About | Contact | FAQ |          Welcome! Sign Out | My Account

# Sec Form 4

| Form 4 Filings | Insider Buys | Significant Buys | Penny Stocks Insider Buying | Insider Sales |
| Insider Buy Sell Ratios | Stock Options | Insider Trading Stock Screener | Insider Trading Graph View | Insider Watch |

## Sec Filings Insider Trading - Steinour Stephen D

Select Time period: 3 Years | Go! | C google | Y yahoo!

Send this page to: Blog Digg Reddit f Facebook SU Stumble del.icio.us

Enter Stock Ticker Symbol or Cik: _____ Search! ✓ Cik Lookup...

Search By Company or Insider Name: _____ Search! Google

"Insiders might sell their shares for any number of reasons, but they buy them for only one: they think the price will rise"
- Peter Lynch ==>> What is insider trading>>

✉ Email a friend >>...

Insider Trading - Steinour Stephen D
(c) http://www.secform4.com/



Total buys $2,578,502, total sales $0, net total $2,578,502
(Vertical in logarithmic scale. Chart based on reported date)

**Goto page 0, 1, Next**

### Common stock purchase or sale:

| Transaction Date | Reported Date | Company | Symbol | Insider Relationship | Shares Traded | Average Price | Total Amount | Shares Owned | Filing |
|---|---|---|---|---|---|---|---|---|---|
| 2016-03-14 Purchase | 2016-03-15 3:16 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 20,000 | $25 | $500,000 | 3,102,687 (Direct) (Indirect) | View |
| 2016-03-02 Purchase | 2016-03-02 4:26 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 10,000 | $9.272 | $92,724 | 3,102,687 (Direct) | View |
| 2016-02-01 Purchase | 2016-02-01 1:16 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 100,000 | $8.571 | $857,064 | 3,092,873 (Indirect) (Direct) | View |
| 2015-04-22 Purchase | 2015-04-24 5:31 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 10,000 | $10.79 | $107,874 | 2,607,283 (Indirect) (Direct) | View |
| 2015-01-26 Purchase | 2015-01-27 2:58 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 9,710 | $10.17 | $98,751 | 2,353,690 (Direct) | View |
| 2014-10-21 Purchase | 2014-10-22 11:04 am | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 17,540 | $9.349 | $163,981 | 2,343,980 (Indirect) (Direct) | View |

### Stock options: Exercise, Award, Grant, Conversion

| Transaction Date | Reported Date | Exercisable Expiration | Company | Symnbol | Insider Relationship | Shares Traded | Conversion Price | Shares Owned | Filing |
|---|---|---|---|---|---|---|---|---|---|
| 2016-05-02 Option Award | 2016-05-04 4:19 pm | N/A N/A | L Brands Inc. | LB | Steinour Stephen D Director | 352 | $0 | 7,374 (Direct) | View |
| 2016-05-01 Tax Withholding | 2016-05-03 4:00 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 6,488 | $10.06 | 3,448,646 (Direct) | View |
| 2016-05-01 Option Award | 2016-05-03 4:00 pm | 2017-05-01 2026-05-01 | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 335,253 | $10.06 | 3,448,646 (Direct) | View |
| 2016-05-01 Option Award | 2016-05-03 4:00 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 168,737 | $0 | 3,448,646 (Direct) | View |
| 2016-04-20 Option Award | 2016-04-22 4:04 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 240,792 | $0 | 3,343,479 (Direct) | View |
| 2016-04-20 Tax Withholding | 2016-04-22 4:04 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 63,570 | $10.28 | 3,343,479 (Direct) | View |
| 2016-03-31 Option Award | 2016-04-04 5:32 pm | N/A N/A | L Brands Inc. | LB | Steinour Stephen D Director | 1,275 | $0 | 7,022 (Direct) | View |
| 2016-03-31 Option Award | 2016-04-01 4:38 pm | N/A N/A | Exelon Corp | EXC | Steinour Stephen D Director | 720 | $34.73 | 31,792 (Indirect) | View |
| 2016-03-31 Option Award | 2016-04-01 4:38 pm | N/A N/A | Exelon Corp | EXC | Steinour Stephen D Director | 885 | $35.86 | 31,792 (Direct) | View |
| 2016-02-19 Tax Withholding | 2016-02-22 5:00 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 13,496 | $8.67 | 3,092,687 (Direct) | View |
| 2016-02-16 Option Award | 2016-02-18 4:03 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 45,766 | $0 | 3,109,760 (Direct) | View |
| 2016-02-16 Tax Withholding | 2016-02-18 4:03 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 3,577 | $8.77 | 3,109,760 (Direct) | View |
| 2016-02-11 Gift | 2016-02-16 5:38 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 25,975 | $0 | 3,063,994 (Direct) | View |
| 2016-02-11 | 2016-02-16 | N/A | | | Steinour Stephen D | | | 3,063,994 | |

| Date / Type | Time | | | Company | Ticker | Name / Title | Shares | Price | Holdings | |
|---|---|---|---|---|---|---|---|---|---|---|
| Tax Withholding | 5:38 pm | N/A | | Huntington Bancshares Inc | HBAN | President, CEO & Chairman | 2,904 | $8.005 | (Direct) | View |
| 2016-02-01 Option Award | 2016-02-03 1:12 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 290 | $0 | 5,581 (Direct) | View |
| 2015-12-31 Option Award | 2016-01-04 6:05 pm | N/A N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 944 | $26.48 | 30,751 (Indirect) | View |
| 2015-12-31 Option Award | 2016-01-04 6:05 pm | N/A N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 1,143 | $27.77 | 30,751 (Direct) | View |
| 2015-11-17 Exercise | 2015-11-18 09:28 am | 2010-01-14 2016-01-14 | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 250,000 | $4.95 | 3,168,563 (Direct) | View |
| 2015-11-17 Exercise | 2015-11-18 09:28 am | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 250,000 | $4.95 | 3,168,563 (Direct) | View |
| 2015-11-17 Tax Withholding | 2015-11-18 09:28 am | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 175,690 | $11.54 | 3,168,563 (Direct) | View |
| 2015-11-06 Exercise | 2015-11-09 09:19 am | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 250,000 | $4.95 | 3,093,941 (Direct) | View |
| 2015-11-06 Tax Withholding | 2015-11-09 09:19 am | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 175,378 | $11.6 | 3,093,941 (Direct) | View |
| 2015-11-06 Exercise | 2015-11-09 09:19 am | 2010-01-14 2016-01-14 | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 250,000 | $4.95 | 3,093,941 (Direct) | View |
| 2015-11-02 Option Award | 2015-11-04 4:25 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 290 | $0 | 5,265 (Direct) | View |
| 2015-09-30 Option Award | 2015-10-01 6:05 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 1,204 | $29.7 | 29,248 (Direct) | View |
| 2015-09-30 Option Award | 2015-10-01 6:05 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 840 | $29.75 | 29,248 (Indirect) | View |
| 2015-08-03 Option Award | 2015-08-05 11:33 am | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 340 | $0 | 4,947 (Direct) | View |
| 2015-06-30 Option Award | 2015-07-01 5:03 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 731 | $34.18 | 27,766 (Direct) | View |
| 2015-06-30 Option Award | 2015-07-01 5:03 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 1,138 | $31.42 | 27,766 (Indirect) | View |
| 2015-06-22 Exercise | 2015-06-23 10:32 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 500,000 | $4.95 | 3,195,322 (Direct) | View |
| 2015-06-22 Tax Withholding | 2015-06-23 10:32 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 351,381 | $11.54 | 3,195,322 (Direct) | View |
| 2015-06-22 Exercise | 2015-06-23 10:32 am | 2010-01-14 2016-01-14 | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 500,000 | $4.95 | 3,195,322 (Direct) | View |
| 2015-05-04 Option Award | 2015-05-06 4:32 pm | N/A N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 309 | $0 | 4,580 (Direct) | View |
| 2015-05-01 Option Award | 2015-05-05 4:19 pm | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 152,662 | $0 | 2,707,162 (Direct) | View |
| 2015-05-01 Tax Withholding | 2015-05-05 4:19 pm | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 11,840 | $10.89 | 2,707,162 (Direct) | View |
| 2015-05-01 I | 2015-05-05 4:19 pm | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 6,296 | $10.95 | 2,707,162 (Indirect) | View |
| 2015-05-01 Option Award | 2015-05-05 4:19 pm | 2016-05-01 2025-05-01 | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 277,237 | $10.89 | 2,707,162 (Direct) | View |
| 2015-04-22 Option Award | 2015-04-24 5:31 pm | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 237,813 | $0 | 2,607,283 (Direct) | View |
| 2015-04-22 Tax Withholding | 2015-04-24 5:31 pm | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 62,783 | $11.03 | 2,607,283 (Direct) | View |
| 2015-04-02 Option Award | 2015-04-06 2:04 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 1,198 | $0 | 4,271 (Direct) | View |
| 2015-03-31 Option Award | 2015-04-01 6:20 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 778 | $32.13 | 26,399 (Indirect) | View |
| 2015-03-31 Option Award | 2015-04-01 6:20 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 945 | $33.61 | 26,399 (Direct) | View |
| 2015-02-19 Tax Withholding | 2015-02-20 5:04 pm | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 13,496 | $10.64 | 2,369,470 (Direct) | View |
| 2015-02-17 Option Award | 2015-02-19 9:32 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 32,177 | $0 | 2,382,966 (Direct) | View |
| 2015-02-11 Tax Withholding | 2015-02-12 6:22 pm | N/A N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 2,901 | $10.5 | 2,350,789 (Direct) | View |
| 2015-02-02 Option Award | 2015-02-04 3:46 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 265 | $0 | 2,990 (Direct) | View |
| 2014-12-31 Option Award | 2015-01-05 11:56 am | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 1,001 | $37.08 | 25,210 (Direct) | View |
| 2014-12-31 Option Award | 2015-01-05 11:56 am | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 696 | $35.94 | 25,210 (Indirect) | View |
| 2014-11-03 Option Award | 2014-11-05 3:40 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 310 | $0 | 2,714 (Direct) | View |
| 2014-09-30 Option Award | 2014-10-01 5:39 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 757 | $33.04 | 24,044 (Direct) | View |
| 2014-09-30 Option Award | 2014-10-01 5:39 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 929 | $34.09 | 24,044 (Indirect) | View |
| 2014-08-19 Option Award | 2014-08-20 11:15 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 397 | $9.736 | 2,328,980 (Indirect) | View |
| 2014-08-15 Option Award | 2014-08-18 4:04 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 10,088 | $9.585 | 2,328,980 (Indirect) | View |

**A further analysis of whether dispositions of stock to the issuer for withholding for a tax liability is exempt from 16 b.**

For a disposition to the issuer by an insider to be exempt from 16 b, it must be exempted by SEC Rule 16 b-3(e).

For a disposition to the issuer to be exempt pursuant to 16 b-3(e) the disposition must be approved by the Board of Directors or of at least two non employee directors with sufficient specificity prior to the disposition. If the grant document of ESOs or SARs or Restricted Stock or RSUs is approved properly and specifically approves the subsequent automatic disposition of shares to the issuer for a tax withholding liability, and the issuer has no discretion regarding the automatic withholding, the grant will achieve an exemption from 16 b by the insider for the automatic disposition.

Below is SEC Rule 16 b-3(e) and Note (3).

**(e)** *Dispositions to the issuer.* Any transaction, other than a Discretionary Transaction, involving the disposition to the issuer of issuer equity securities, whether or not intended for a compensatory or other particular purpose, shall be exempt, provided that the terms of such disposition are approved in advance in the manner prescribed by either paragraph (d)(1) or paragraph (d)(2) of this section.

**Note (3):**

The approval conditions of paragraphs (d)(1), (d)(2) and (e) of this section require the approval of each specific transaction, and are not satisfied by approval of a plan in its entirety except for the approval of a plan pursuant to which the terms and conditions of each transaction are fixed in advance, such as a formula plan. Where the terms of a subsequent transaction (such as the exercise price of an option, or the provision of an exercise or tax withholding right) are provided for in a transaction as initially approved

1

pursuant to paragraphs (d)(1), (d)(2) or (e), such subsequent transaction shall not require further specific approval.

A) So if the terms of the disposition to the issuer (such as the provision of an automatic tax withholding of shares by the issuer for taxes) are provided for in a transaction as initially approved pursuant to paragraphs (d)(1), (d)(2) or (e), such subsequent transaction shall not require further specific approval.

So what type of language is needed in the transaction as initially approved to get the subsequent automatic disposition of stock to the issuer for tax withholding to be exempt under 16 b-3(e)?

The SEC gave some indication of the type of language that is needed in the Q and A to and from the SEC Staff on May 23, 2007. See the Q and A below:

Question 123.16

**Question: Would approval of a grant that by its terms provides for automatic reloads satisfy the specificity of approval requirements under Rule 16b-3(d) for the reload grants?**

**Answer: Yes. Approval of a grant that by its terms provides for automatic reloads would satisfy the specificity of approval requirements under Rule 16b-3(d) for the reload grants, unless the automatic reload feature permitted the reload grants to be withheld by the issuer on a discretionary basis.**

**The same result applies under Rule 16b-3(e) where the automatic feature is a tax- or exercise-withholding right. [May 23, 2007]**

Lets examine the Q and A.

It addresses the question of automatic reloads of ESOs or SARs or RSUs when the ESOs or SARs are exercised or when the RSUs vest.

When there is an automatic reload provision, the grantee has no control over whether the grantee will receive a reload. However, the grant agreement may give the issuer

2

discretion to reload or not. When the issuer has discretion about the reloads, the automatic reloads are subject to the issuer discretion and there is no exemption from 16 b under 16 b-3(d) for the future reloads to the grantee.

## B

The SEC staff also says **the same result applies under Rule 16 b-3(e) where the automatic feature is a tax- or exercise-withholding right.**

Now what exactly does the last sentence mean? It means, in my view, that when the disposition of shares for a tax liability is an automatic feature, the disposition is exempt assuming that the issuer does not have discretion to deny the automatic disposition of stock to pay for a tax liability.

Does the last sentence allow the holder of the shares to dispose of the shares to the issuer with the disposition being exempt from 16 b), even when the grantee has a choice of delivering shares or delivering cash for the tax liabilities as part of the initial grants?

The answer is no. The last sentence in the SEC Staff answer means that when the automatic withholding of shares of stock is made by the issuer, that withholding for a tax liability is exempt from 16 b if the withholding is not discretionary by the issuer?

It means that when the disposition of shares for a tax liability is automatic (i.e. when the grantee does not have a choice of delivering shares or delivering cash), the disposition is exempt assuming that the issuer does not have discretion to deny the automatic disposition of stock to pay for a tax liability.

If the disposition is not automatic but the decision is left to the grantee, then the disposition is not exempt. In most cases the grant agreement does not require automatic disposition of stock for the tax liability withholding.

Of course Romeo and Dye have forgotten about the fact that the Q and A from the SEC Staff deals with the automatic feature and expresses an opinion where the feature is not automatic (i.e. when the grantee has a choice).

Their conclusion is counter to the object of 16 b since their interpretation allows the executive to deliver shares to the company for a tax payment when the executive knows the stock will drop and deliver cash when they know the stock will rise.

3

Below is a link to the IRS discussion on Equity based compensation

The paragraphs in blue are parts of the link below.

https://www.irs.gov/businesses/corporations/equity-stock-based-compensation-audit-techniques-guide

## IRS

### Equity (Stock) - Based Compensation Audit Techniques Guide (August 2015)

**Determine whether a substantial risk of forfeiture exists depends on the facts and circumstances.** Generally, a substantial risk of forfeiture exists only if rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or upon the occurrence of a condition related to a purpose of the transfer. Property is not considered transferred if it is subject to a substantial risk of forfeiture, and at the time of transfer, the facts and circumstances demonstrate that the forfeiture condition is unlikely to be enforced. See Treas. Reg. §1.83-3(c) for the definition and examples of substantial risks of forfeiture.

*Section 16b Executives*

Individual(s) that qualify as an executive under the section 16(b) of the Securities Exchange Act of 1934 could be subject to suit if sold the stock at a profit within six months after the purchase of the stock. These individual's rights in the property are treated as subject to a substantial risk of forfeiture and as not transferable until the earlier of (i) the expiration of such six-month period, or (ii) the first day on which the sale of such property at a profit will not subject the individual to suit under section 16(b) of the Securities Exchange Act of 1934.

The above is an exact quote from the IRS.

This is confirmed by the 9th Circuit Court of Appeals in Strom v. U.S. below

BERZON, Circuit Judge:
Ordinarily, when an employee is compensated with non-statutory stock options that do not have a readily ascertainable fair market value at the time of the grant, the employee realizes income for tax purposes upon *exercising* the options.1 *See* 26 U.S.C. §§ 83(a) & (e)(3)-(e)(4); 26 C.F.R. § 1.83-7(a). The taxpayer is taxed on an amount equal to the fair market value of the stock on the date of exercise minus the option price paid for the stock. *See* 26 C.F.R. § 1.83-1(a)(1); *id.* § 1.83- 7(a).

**1**

Statutory stock options are compensatory options meeting criteria entitling them to special treatment under the Internal Revenue Code. *See* 26 U.S.C. § 422. Compensatory options that do not meet these requirements are referred to as "nonstatutory." *See United States v. Tuff*, 469 F.3d 1249, 1251 n.2 (9th Cir. 2006) (citing *Cramer v. Comm'r*, 64 F.3d 1406, 1408-09 (9th Cir. 1995)).

Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3). Section 16(b), in turn, forbids a corporate insider from profiting on a purchase made within six months of a sale (or a sale made within six months of a purchase) of the corporation's stock. *See* 15 U.S.C. § 78p(b).

If a taxpayer is permitted to defer tax consequences under IRC § 83(c)(3), the taxpayer will be later taxed on an amount equal to the fair market value of the stock on the date that § 83(c)(3) no longer applies minus the option price paid for the stock. *See* 26 U.S.C. § 83(a); 26 C.F.R. § 1.83-1(a)(1).

------------------------

The words below are mine

In other words, if a non exempt sale of stock occurs 3 months after the non exempt purchase of stock occurs and there is a profit made on the two transactions, the profit is recoverable by the company (issuer).

Therefore during the six months period after the non exempt purchase, the individual who receives stock from vesting of RS or RSUs or exercises of ESOs has his shares subject to risk of forfeiture and is not subject to tax on the vested RS , RSU and the exercised ESOs intrinsic value during the 6 month period after the purchase of the stock. The tax comes after and the tax deduction to the company comes after the period of "substantial risk of forfeiture " ends.

So the tax withholding is premature on the day of vesting of RS or RSU or exercise of ESOs if there was a non exempt purchase within 6 months prior to the vesting of RS or RSUs or exercise of ESOs.

--------------------------------------------------------

In 2014, the IRS addressed the issue of IRC 83(c)(3) and the possibility that an insider could extend the tax liability from RS and RSU vesting and exercises of ESOs and SARs indefinitely by merely making non exempt market purchases of stock just prior to the vesting or exercises and making additional purchases immediately prior to 6 months after the earlier most recent purchase .

The IRS essentially said that the tax liability from vesting or exercises could only be deferred for a maximum of 6 month from one non exempt purchase.

But they gave an example to illustrate the point which makes some observers believe the example means something else.

The examples 4 (i) and (iii) follow:

**(i)** On June 3, 2013, Y corporation grants to Q, an officer of Y, a nonstatutory option to purchase Y common stock. Y stock is traded on an established securities market. Although the option is immediately exercisable, it has no readily ascertainable fair market value when it is granted. Under the option, Q has the right to purchase 100 shares of Y common stock for $10 per share, which is the fair market value of a Y share on the date of grant of the option. The grant of the option is not one that satisfies the requirements for a transaction that is exempt from section 16(b) of the Securities Exchange Act of 1934. On December 15, 2013, Y stock is trading at more than $10 per share. On that date, Q fully exercises the option, paying the exercise price in cash, and receives 100 Y shares. Q's rights in the shares received as a result of the exercise are not conditioned upon the future performance of substantial services. Because no exemption from section 16(b) was available for the June 3, 2013 grant of the option, the section 16(b) liability period expires on December 1, 2013. Accordingly, the section 16(b) liability period expires *before* the date that Q exercises the option and the Y common stock is transferred to Q. Thus, the shares acquired by Q pursuant to the exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b). As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.

**(iii)** Assume the same facts as in paragraph (i) of this *Example 4* except that on November 5, 2013, Q also purchases 100 shares of Y common stock on the public market. The purchase of the shares is not a transaction exempt from section 16(b) of the Securities Exchange Act of 1934. Because no exemption from section 16(b) was available for the November 5, 2013 purchase of shares, the section 16(b) liability period with respect to such shares will last for a period of six months after the November 5, 2013 purchase of shares. Notwithstanding the non-exempt purchase of Y common stock on November 5, 2013, the shares acquired by Q pursuant to the December 15, 2013 exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b). As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.

3

This example says:

   a) Assume that there is a non exempt grant on June 30, 2013 of nonstatutory
      options to purchase common stock, although more than 99% of the grants of of
      ESOs are not "non-exempt". If the grant is non exempt this means for 16 b
      purposes it is treated as a "deemed purchase" of the stock and matchable versus
      any non exempt sales within less than 6 months of stock for 16 b purposes.

   b) Assume Q also makes a market purchase of 100 shares stock on Nov 5, 2013
      which has the same status for 16 b purposes as the grant of the ESOs mentioned
      above.

   c) Assume that on Dec 15, 2013, the ESOs are exercised and the shares are
      acquired.

   d) Even if there would be case for a 16 b disgorgement in the event of a sale of the
      stock acquired within 6 months of Nov 5, 2013, the tax liability would occur on
      December 15, 2013.

-------------------------------------------------------------------------

However if the grant of the ESOs in the example was exempt from 16 b, which almost
all grants are, then the tax liability would be deferred until 6 months after the purchase
of stock on November 5, 2013.

The paragraph highlighted above is what the examples mean.

If the IRS changed the law, from what the 9th Circuit in Strom v. U.S said the law was, then why
did not the IRS make it clear by clearly assuming that if the only non exempt purchase was on
Nov. 5, 2013 and the exercise was December 15, 2013, the tax liability was not deferred beyond
December 15, 2013?

The answer is that the purpose was to allow just one deferrence to a maximum of 6 months
after the non exempt purchase occurred prior to the exercise of the ESOs or vesting of RS.

4

# Exhibit 2

WACHTELL, LIPTON, ROSEN & KATZ

MARTIN LIPTON
HERBERT M. WACHTELL
PAUL VIZCARRONDO, JR.
PETER C. HEIN
HAROLD S. NOVIKOFF
THEODORE N. MIRVIS
EDWARD D. HERLIHY
DANIEL A. NEFF
ANDREW R. BROWNSTEIN
PAUL K. ROWE
MARC WOLINSKY
DAVID GRUENSTEIN
STEVEN A. ROSENBLUM
JOHN F. SAVARESE
SCOTT K. CHARLES
JODI J. SCHWARTZ
ADAM O. EMMERICH
GEORGE T. CONWAY III
RALPH M. LEVENE
RICHARD G. MASON
MICHAEL J. SEGAL

DAVID M. SILK
ROBIN PANOVKA
DAVID A. KATZ
ILENE KNABLE GOTTS
JEFFREY M. WINTNER
TREVOR S. NORWITZ
BEN M. GERMANA
ANDREW J. NUSSBAUM
RACHELLE SILVERBERG
STEVEN A. COHEN
DEBORAH L. PAUL
DAVID C. KARP
RICHARD K. KIM
JOSHUA R. CAMMAKER
MARK GORDON
JOSEPH D. LARSON
LAWRENCE S. MAKOW
JEANNEMARIE O'BRIEN
WAYNE M. CARLIN
STEPHEN R. DiPRIMA
NICHOLAS G. DEMMO

51 WEST 52ND STREET
NEW YORK, N.Y. 10019-6150
TELEPHONE: (212) 403-1000
FACSIMILE: (212) 403-2000

GEORGE A. KATZ (1965-1989)
JAMES H. FOGELSON (1967-1991)
LEONARD M. ROSEN (1965-2014)

OF COUNSEL

WILLIAM T. ALLEN
MICHAEL H. BYOWITZ
PETER C. CANELLOS
DAVID M. EINHORN
KENNETH B. FORREST
THEODORE GEWERTZ
RICHARD D. KATCHER
MEYER G. KOPLOW
DOUGLAS K. MAYER
ROBERT B. MAZUR
MARSHALL L. MILLER
PHILIP MINDLIN
ROBERT M. MORGENTHAU
DAVID M. MURPHY

DAVID S. NEILL
BERNARD W. NUSSBAUM
LAWRENCE B. PEDOWITZ
ERIC S. ROBINSON
PATRICIA A. ROBINSON*
ERIC M. ROTH
MICHAEL W. SCHWARTZ
STEPHANIE J. SELIGMAN
ELLIOTT V. STEIN
WARREN R. STERN
PATRICIA A. VLAHAKIS
ANTE VUCIC
AMY R. WOLF

* ADMITTED IN THE DISTRICT OF COLUMBIA

COUNSEL

DAVID M. ADLERSTEIN
AMANDA K. ALLEXON
LOUIS J. BARASH
FRANCO CASTELLI
DIANNA CHEN
ANDREW J.H. CHEUNG
PAMELA EHRENKRANZ
UMUT ERGUN
KATHRYN GETTLES-ATWA

ADAM M. GOGOLAK
PAULA N. GORDON
NANCY B. GREENBAUM
MARK A. KOENIG
LAUREN M. KOFKE
J. AUSTIN LYONS
ALICIA C. McCARTHY
S. CHRISTOPHER SZCZERBAN
JEFFREY A. WATIKER

IGOR KIRMAN
JONATHAN M. MOSES
T. EIKO STANGE
DAVID A. SCHWARTZ
JOHN F. LYNCH
WILLIAM SAVITT
ERIC M. ROSOF
MARTIN J.E. ARMS
GREGORY E. OSTLING
DAVID B. ANDERS
ANDREA K. WAHLQUIST
ADAM J. SHAPIRO
NELSON O. FITTS
JOSHUA M. HOLMES
DAVID E. SHAPIRO
DAMIAN G. DIDDEN
IAN BOCZKO
MATTHEW M. GUEST
DAVID E. KAHAN
DAVID K. LAM
BENJAMIN M. ROTH

JOSHUA A. FELTMAN
ELAINE P. GOLIN
EMIL A. KLEINHAUS
KARESSA L. CAIN
RONALD C. CHEN
GORDON S. MOODIE
DONGJU SONG
BRADLEY R. WILSON
GRAHAM W. MELI
GREGORY E. PESSIN
CARRIE M. REILLY
MARK F. VEBLEN
VICTOR GOLDFELD
EDWARD J. LEE
BRANDON C. PRICE
KEVIN S. SCHWARTZ
MICHAEL S. BENN
SABASTIAN V. NILES
ALISON ZIESKE PREISS

DIRECT DIAL: (212) 403-1382
DIRECT FAX: (212) 403-2382
E-MAIL: SRDiPrima@wlrk.com

August 30, 2016

**VIA FEDERAL EXPRESS**

John Olagues
413 Sauve Road
River Ridge, LA 70123

      Re:    Huntington Bancshares Inc.

Dear Mr. Olagues:

      We are writing in response to your letter, dated July 5, 2016, asserting that certain dispositions of Huntington stock by Stephen Steinour are subject to Section 16(b) of the Securities Exchange Act of 1934. Huntington has reviewed the allegations in your letter and determined that they are without merit.

      Rule 16b-3(e) provides that transactions "involving the disposition to the issuer of issuer equity securities . . . shall be exempt" from Section 16(b) if such transactions are approved by a committee of the board composed solely of two or more non-employee directors. The transactions at issue involved dispositions by Mr. Steinour of Huntington stock to Huntington in connection with the vesting and exercise of previously approved equity compensation awards. The terms of the equity awards at issue were approved by the Compensation Committee, which

John Olagues
August 30, 2016
Page 2

is comprised solely of non-employee directors, and those terms permit Mr. Steinour to satisfy the exercise price and any tax withholding obligations through the delivery by him of previously owned shares and/or the withholding of shares otherwise deliverable in connection with the vesting or exercise of the underlying award. The transactions, therefore, satisfy Rule 16b-3(e).

Your argument that the transactions do not qualify for the exemption because Mr. Steinour could have elected to dispose of the stock in another manner finds no support in the language of the rule, the notes to the rule, or any other authority. As explained in Note 3 to Rule 16b-3, "[w]here the terms of a subsequent transaction (*such as the . . . provision of an exercise or tax withholding right*) are provided for in a transaction as initially approved . . . , such subsequent transaction shall not require further specific approval" to be exempt from Section 16(b). Contrary to the assertions in your letter, nothing in the text of the rule or otherwise suggests that Rule 16b-3 does not apply where a grantee has the option to elect one of several methods for disposition. Indeed, the SEC Release adopting the rule specifically states that "the exercise of a right to surrender or withhold securities in connection with the exercise of a derivative security or satisfaction of a tax obligation will be an exempt disposition of issuer equity securities to the issuer." SEC Release No. 34-37260. In addition, the caselaw considering this issue has held that equity awards providing grantees with a "number of ways of paying the exercise price" are within the scope of Rule 16b-3. *Donoghue* v. *Casual Male Retail Grp.*, 427 F. Supp. 2d 350, 356 (S.D.N.Y. 2006).

As a result of the foregoing, Huntington does not intend to take any further action in response to your letter.

Sincerely,

*Stephen R. DiPrima*

Stephen R. DiPrima

cc: Richard A. Cheap, Executive Vice President and General Counsel (by email)

# Exhibit 3

John Olagues
413 Sauve Rd
River Ridge LA 70123
olagues@gmail.com
504- 305-4071

Stephen R. DiPrima
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, N.Y. 10019-6150

September 23, 2016

Dear Mr DiPrima:

Attached are two articles that I have written recently which illustrate violations of Section 16 b of the 1934 Securities Act, but which many attorneys, including yourself apparently believe are exempted by SEC Rule 16 b-3(e).

The matched off profits that Mr. Steinour, President, CEO & Chairman Director of Huntington Bancshares Inc. realized from the several transactions are illustrated below.

| Shares Purchased | Date | Price | Shares Disposed | Date | Price | Profit |
|---|---|---|---|---|---|---|
| 10,000 | 3/2/2016 | $9.27 | 10,000 | 11/6/2015 | $11.60 | $23,300 |
| 100,000 | 2/1/2016 | $8.57 | 100,000 | 11/6/2015 | $11.60 | $303,000 |
| 10,000 | 4/22/2015 | $10.79 | 10,000 | 6/22/2015 | $11.54 | $7500 |
| 9710 | 1/26/2015 | $10.17 | 9710 | 6/22/2015 | $11.54 | $13,302 |
| 13,496 | 10/21/2014 | $9.35 | 13,496 | 2/19/2015 | $10.64 | $17,409 |
| 2901 | 10/21/2014 | $9.35 | 2910 | 2/11/2015 | $10.50 | $3,336 |

Total profits………………………… $367,847

1

These figures were the result of matching off the lowest priced purchases with the highest price sales within less than 6 months.

Those highlighted are match offs where the purchase was prior to the disposition (i.e. the sale). For the highlighted match offs, the basis of the violation are twofold:
 1) the dispositions to the issuer are not "automatic" as necessary for an exemption from 16 b via SEC Rule 16 b-3(e) as explained in one of my articles.
2) The dispositions were for a tax liability when there was no tax liability as the income calculation and tax liability had been deferred pursuant to IRC 83(c)(3). Nothing in any document shows that there was an approval of a disposition to the issuer which was for a future tax liability that has not even been calculated on the day of the disposition.

The total of the match offs would have been different had I just matched off the dispositions that followed the purchases as illustrated (and highlighted) below and thus the income calculation and taxes were deferred:

| Shares Purchased | Date | Price | Shares Disposed | Date | Price | Profit |
|---|---|---|---|---|---|---|
| 10,000 | 3/2/2016 | $9.27 | 10,000 | 11/6/2015 | $11.60 | $23,300 |
| 63,570 | 2/1/2016 | $8.57 | 63,570 | 4/20/2016 | $10.28 | $108,704 |
| 6488 | 2/1/2016 | $8.57 | 6,488 | 5/1/2016 | $10.06 | $9,816 |
| 10,000 | 4/22/2015 | $10.79 | 10,000 | 6/22/2015 | $11.54 | $7500 |
| 9710 | 1/26/2015 | $10.17 | 9710 | 6/22/2015 | $11.54 | $13,302 |
| 13,496 | 10/21/2014 | $9.35 | 13,496 | 2/19/2015 | $10.64 | $17,409 |
| 2901 | 10/21/2014 | $9.35 | 2910 | 2/11/2015 | $10.50 | $3,336 |

Total profits from purchases and sales when the sales were dispositions to the issuer for deferred tax liabilities (highlighted) = $160,067.

So if the required "automatic" disposition applied, the recovery of profits by Huntington Bancshares would be $367,847. If only the IRC 83 (c)(3) analysis applied, the recovery would be $160,067.

2

I am happy to try to settle the 16 b matter for 10% of the amount recoverable under the "automatic" disposition analysis for my consulting services .

Please let me know if you are interested in disposing of the matter.

John Olagues

**3**

**Improper interpretation of SEC Rule 16 b-3(e) promotes insider trading abuses?**

1. There are large numbers of cases where officers or directors make dispositions of shares to the issuer company instead of cash for the payment for tax liabilities from:

A. Restricted stock and Restricted stock units vesting or
B. Employee stock options and SARs being exercised

These tax liabilities generally occur when the Restricted stock vests and when Restricted stock units vest. The tax liabilities also generally occur when exercises of ESOs and SARs are made.

However, there are times when the tax liability is deferred pursuant to IRC 83(c)(3), because of purchases of stock within less than 6 months prior to the vesting of Restricted stock or RSUs or within less than 6 months prior to the exercises of ESOs or SARs.

2. There are also untold numbers of cases where officers or directors make dispositions of shares of stock to the issuer company instead of cash for the payment of the exercise price when Employee stock options or SARs are exercised.

SEC Rule 16-3(d) and Rule 16-3(e) are designed to allow transactions between the officers or directors and the issuer company while making those transactions exempt from Section 16 b of the 1934 Securities Act. The idea is that by exempting these transactions from Section 16 b, it will encourage more transactions for equity compensation and more chances for investment opportunities by the officers and directors in the issuer shares or other equity securities of the issuer.

Since it is reasonable to assume that an officer or a director does not have more inside information than the company's board as a whole has, the officer or director can not take advantage of the company which is on the other side of the transaction.

This lack of advantage by the officer or director in dealing with the issuer company due to both having the same inside information is based on the assumption that the issuer company can chose not to transact with the officer or director if the transaction is apparently to the disadvantage of the issuer company.

1

For example:

Assume there is an expected buyout in the works where the stock will rise sharply in the next three weeks, where both the officer and the issuer have the same non-public inside information. If the officer offers to buy 500,000 shares from the issuer company at the market prices before the rise and before the non-public information becomes public, surely the issuer company would be inclined to reject the sale to the officer. In fact, if the Board made the decision to sell the 500,000 shares at market prices before the inside information becomes public, that would probably make the Board members subject to a suit for violation of its Fiduciary Duties to the shareholders.

However, if the Board **was required to accept** the offer, the fact that the issuer's Board had the same inside information as the officer would not help the company avoid the officer trading on non-public inside information to the company's disadvantage.

The situation is similar when an officer or director of a company has non-public positive inside information when his/her Restricted Stock or Restricted Stock Units vest and the officer or director chooses to pay cash for the tax liability to maximize his/her long position, when positive news is coming very soon.

The situation is similar to when an officer or director of a company has non-public positive inside information when his/her Employee Stock Options or SARs are exercised and the officer or director chooses to pay cash for the exercise price to maximize his/her long position.

Below is another example of the insider trading with the issuer:

Assume that the stock is trading at $50.00 in the market, and officer X owns 100,000 Restricted shares which will vest in two days. Assume that the Restricted Stock Grant Agreement gives officer X the choice to deliver shares or cash for taxes upon vesting and the issuer has no discretion to not accept the shares for taxes.

2

Assume also that officer X and the issuer have inside information that bad earnings will become public in a week after the vesting of the 100,000 shares owned by officer X.

Assume that officer X upon vesting, delivers 50,000 shares to the issuer for the taxes due to the vesting. Officer X now owns just 50,000 shares (i.e. 50% of what he/she would have owned had he/she paid the taxes in cash as the Grant Agreement allowed).

The officer would own 50,000 fewer shares than he/she would own if the tax was paid in cash. And, as a result, the issuer would own 50,000 more shares than the issuer would have had if there was no disposition of the 50,000 shares for taxes, but the taxes were paid with cash.

So the fact that the issuer company had the same non-public information as officer X would not stop officer X from trading on inside information with the issuer since the issuer was compelled to acquire the shares. This results in a violation of insider trading which is what Section 16 b of the 1934 Act was meant to stop.

On May 23, 2007, the SEC recognized the fact that allowing the choice to the officer of disposing shares to the company or delivering cash for taxes, where the issuer had no discretion to not accept the stock disposition, effectively allowed the officer to trade on inside information and get an exemption from Section 16 b.

The SEC staff then published their Q and A # 123.16 on May 23, 2007 which essentially gave two examples of what is required to get an exemption via SEC Rule 16 b-3 . Both examples addressed automatic features built into the grant agreements of Employee Stock Options. The first example addressed a situation where the automatic feature was a reload of new options. The second example addressed a situation where the automatic feature was the withholding of shares by the issuer to pay for the exercise prices or for a tax liability. The SEC staff concluded that when there are these automatic features built into the grant agreements, there are exemptions from Section 16 b via SEC Rule 16 b-3 only when the issuer  must accept reload or the disposition of shares for tax liabilities or the exercise prices.

3

The SEC staff stated that the reload feature had to be automatic to be exempt from 16 b via SEC Rule 16 b-3(d), assuming that the issuer has no discretion (i.e. the issuer was required to grant the reload).

The SEC staff also said that the necessary elements for exemption under SEC Rule 16 b-3(e) for dispositions of shares by an officer or director for withholding by the issuer for a tax liability or an exercise price payment to the issuer are 1) the dispositions had to be automatic, and 2) that the issuer has no discretion (i.e. the issuer was required to accept the disposition of shares for taxes or exercise price payments).

The May 23, 2007 Q and A is below with "automatic" highlighted:

**Question 123.16**

**Question: Would approval of a grant that by its terms provides for automatic reloads satisfy the specificity of approval requirements under Rule 16b-3(d) for the reload grants?**

**Answer: Yes. Approval of a grant that by its terms provides for automatic reloads would satisfy the specificity of approval requirements under Rule 16b-3(d) for the reload grants, unless the automatic reload feature permitted the reload grants to be withheld by the issuer on a discretionary basis.**

**The same result applies under Rule 16b-3(e) where the automatic feature is a tax- or exercise-withholding right. [May 23, 2007]**

Some attorneys including Romeo and Dye apparently express the view that, notwithstanding the SEC Q and A, non-automatic dispositions to the issuer for exercise price payments or for tax liabilities also can achieve an exemption under 16 b-3(e), if the issuer has **no discretion** to accept the disposition or not accept the disposition.

So these attorneys, citing the case Donoghue v. Casual Male 437 F.Supp. 2d 350 (2006), claim that even when the officer has inside information, he/she can use that inside information to his/her advantage by delivering shares to the issuer which can not reject them and the officer can achieve an exemption from 16 b via SEC Rule 16 b-3(e), regardless of the disadvantage to the issuer.

4

These views by some attorneys are in direct contradiction of the purpose of Section 16 b and transactions based on these attorneys' expressed terms should not be exempted, especially when the SEC expressed the view that it is necessary to have both an automatic disposition and no discretion on the part of the issuer to achieve an exemption from 16 b.

Below is a paragraph from a relevant case:

### United States Court of Appeals, Third Circuit.

**Mark LEVY, Appellant v. STERLING HOLDING COMPANY, LLC; National Semiconductor Corporation; Fairchild Semiconductor International, Inc. No. 07-1849.  Decided: October 1, 2008**

*According to the statute itself, the purpose of section 16(b) is "preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b).  The statute authorizes the SEC to promulgate rules and regulations exempting from liability transactions that are "not comprehended within [this] purpose." Id.;  see Levy I, 314 F.3d at 112.  Exercising this authority, the SEC has established a number of section 16(b) exemptions. See 17 C.F.R. §§ 240.16b-1, .16b-3, .16b-5 to .16b-8 (codifying SEC Rules 16b-1, 16b-3, and 16b-5 to 16b-8).*

This statement in the often quoted case clearly says that the SEC can exempt only transactions that are "*not comprehended with (this) purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer.*"

Discretionary disposing shares by the insider to the issuer for a tax liability or exercise price when the issuer is required to accept the disposition of shares is comprehended within the purpose of Section 16 b and can not be exempted by the SEC.

John Olagues

5

This article starts with the presentation of the statute 26 U.S. Code 83

26 U.S. Code § 83 - Property transferred in connection with performance of services

**(a)General rule**

*If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—*

  **(1)**

*the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over*

**(2)**

*the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.*

-----------------------------------------------

My words follow:

So when Restricted Stock, RSUs and the like are transferred from the issuer company to an executive, the executive shall have the value of the stock received included in gross income when the shares vest in the executive if the shares are transferable and are not subject to a substantial risk of forfeiture.

1

And when ESOs and SARs and the like are transferred from the issuer company to an executive, the executive shall have the "intrinsic value" received upon exercising included in gross income if the shares received are transferable or are not subject to a substantial risk of forfeiture.

**83 (c)(3) says the following:**

**Sales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934**

*So long as the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are—*

*(A)    subject to a substantial risk of forfeiture, and*

*(B)    not transferable.*

My words follow:

This says clearly that when a sale of the stock received after vesting **which may give rise to suit under section 16(b)** of the **Securities Exchange Act of 1934**, those shares are subject to a substantial risk of forfeiture, and not transferable. And the income calculation and the tax liability is deferred to when the sale of the stock will not give rise to suit under 16 b.

Below is the paragraph from an IRS Bulletin of March 17, 2014

*"Certain practitioners informally requested clarification regarding the application of section 83(c)(3) to a variation of the facts set forth in Example 4 of proposed regulation § 1.83–3(j)(2). Specifically, practitioners asked whether the **purchase of shares** in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934 **prior to the exercise of a stock option** that would not otherwise give rise to section 16(b) liability would defer taxation of the stock option exercise. Treasury and the IRS do not believe that such a non-exempt purchase of*

*shares would defer taxation of the subsequent stock option exercise. This result is consistent with Example 3 of § 1.83–3(j)(2). In response to these requests for clarification, Treasury and the IRS have revised Example 4 of proposed regulation § 1.83–3(j)(2) to address the situation raised."*

**Below is a 100% Precise Interpretation of the paragraph above.**

The paragraph above means that if an insider buys non exempt shares 3 months prior to an exercise of non exempt NQESO  that would not otherwise give rise to section 16(b) liability, this would not defer taxation of the income from the stock option exercise.

However, if the non exempt  purchase of the shares was 3 months prior to the exercise of NQESOs and those transactions would give rise to a section 16 (b) liability upon a sale of stock at a profit from the share price 3 months earlier, this would defer taxation of the exercise for  3 months. However: if the stock received from the exercise traded lower than the purchase price 3 months before the exercise, the tax liability would occur on the day that the stock traded lower.

There are attorneys who try to promote the idea that IRC 83(c)(3) seldom if ever applies. They refer to the Examples 4(i),(ii),(iii)( from the IRS on Jan 31, 2014 from Federal Register and A Rule by the IRS on 2/26/2014) in support of the idea that the only time that IRC 83 (c)(3) applies is when the original grant of ESOs, SARs, Restricted stock or RSUs is not exempt from 16 b and is considered the matchable purchase with the possible subsequent sale of stock received from the exercise of ESOs or SARs or vesting of Restricted Stock or RSUs.

In my history with grants of ESOs, I have never seen a grant of ESOs that was not exempt or not exempt and immediately exercisable. I have never seen a grant of Restricted stock that was not exempt from 16 b.

**3**

Perhaps one grant in 10,000 grants is non exempt from 16 b of the 1934 Act.

So let's analyse these Examples 4 (i),(ii), and (iii) starting with Example 4(i) below:

*(i) On June 3, 2013, Y corporation grants to Q, an officer of Y, a nonstatutory option to purchase Y common stock. Y stock is traded on an established securities market. Although the option is immediately exercisable, it has no readily ascertainable fair market value when it is granted. Under the option, Q has the right to purchase 100 shares of Y common stock for $10 per share, which is the fair market value of a Y share on the date of grant of the option. The grant of the option is not one that satisfies the requirements for a transaction that is exempt from section 16(b) of the Securities Exchange Act of 1934. On December 15, 2013, Y stock is trading at more than $10 per share. On that date, Q fully exercises the option, paying the exercise price in cash, and receives 100 Y shares. Q's rights in the shares received as a result of the exercise are not conditioned upon the future performance of substantial services. Because no exemption from section 16(b) was available for the June 3, 2013 grant of the option, the section 16(b) liability period expires on December 1, 2013. Accordingly, the section 16(b) liability period expires before the date that Q exercises the option and the Y common stock is transferred to Q. Thus, the shares acquired by Q pursuant to the exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b). As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.*

4

**Sentence 1**

*On June 3, 2013, Y corporation grants to Q, an officer of Y, a nonstatutory option to purchase Y common stock.*

------------------------------------------------------

Most ESOs are nonstatutory, perhaps 95 % are. Nonstatutory ESOs are ones where the taxable income when the ESOs are exercised equals the "intrinsic value" of the ESOs when exercised and the stock received is transferable and not subject to being forfeited. See IRC 83(c)(3) below:

**(3)Sales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934**

So long as the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are

A: subject to a substantial risk of forfeiture, and

B: not transferable.

--------------------------------------------------------------------

**5**

## Sentence 2

*Y stock is traded on an established securities market.*

This means the shares received from exercises or vesting have a market where shares received can be sold reasonably easily

-----------------------------------------------------------------------------

## Sentence 3

*Although the option is immediately exercisable, it has no readily ascertainable fair market value when it is granted.*

This means that it is assumed that the options can be exercised anytime from the first day it was granted (which is quite rare) and there is no ascertainable fair market value when granted. Thus it is not taxed on the grant day.

-------------------------------------------------------

## Sentence 4.

*Under the option, Q has the right to purchase 100 shares of Y common stock for $10 per share, which is the fair market value of a Y share on the date of grant of the option.*

Generally ESOs are granted with an exercise price equal to the current market value. In this example the exercise price is set at $10.00 which is the market value on the grant day.

-------------------------------------------------------------

6

### Sentence 5

*The grant of the option is not one that satisfies the requirements for a transaction that is exempt from section 16(b) of the Securities Exchange Act of 1934.*

This means that the grant of the ESOs can be deemed a purchase matchable to a sale for 16 b purposes.

-------------------------------------------------------------

### Sentence 6 and 7

*On December 15, 2013, Y stock is trading at more than $10 per share.   On that date, Q fully exercises the option, paying the exercise price in cash, and receives 100 Y shares.*

This sentence means that the exercise on December 15, 2013 is outside of six months from the grant of the ESOs and the sale of any stock received by the exercise of the ESOs can not be matched for 16 b purposes with the grant of the non exempt purchase on June 3, 2013 even though the shares are trading above the exercise price.

-------------------------------------------------

### Sentence 8

*Q's rights in the shares received as a result of the exercise are not conditioned upon the future performance of substantial services.*

This means that generally the "intrinsic value" equals taxable income upon exercise.

**7**

--------------------------------------------------------

## Sentence 9 and 10

*Because no exemption from section 16(b) was available for the June 3, 2013 grant of the option, the section 16(b) liability period expires on December 1, 2013. Accordingly, the section 16(b) liability period expires before the date that Q exercises the option and the Y common stock is transferred to Q.*

These sentences are accurate but they do not mention that the grants of ESOs are almost always exempt from 16 b. Thus the grants can very rarely if ever be matched with a sale of any stock or derivative. So when does the 16 b liability period expire, if the grants of the ESOs are exempt from section 16 b?

The question becomes "why did the IRS give an example of something that has probably never happened?" to illustrate the meaning of IRC 83 (c)(3).

--------------------------------------------------------

## Sentence 11

*Thus, the shares acquired by Q pursuant to the exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b).*

This is true because of the fact that more than 6 months have passed from the grant on June 3, 2013, although the shares were trading at a price higher than $10.00 , when the exercise of the non exempt ESOs took place.

--------------------------------------------

**8**

**Sentence 12**

*As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.*

This conclusion is correct under the assumptions above.

-----------------------------------------------------------------------------------

We now turn to Example 4(ii) which is below:

*(ii) Assume the same facts as in paragraph (i) of this Example 4 except that Q exercises the nonstatutory option on October 30, 2013 when Y stock is trading at more than $10 per share. The shares acquired are subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b) through December 1, 2013.*

9

**Sentence 1**

*Assume the same facts as in paragraph (i) of this Example 4 except that Q exercises the nonstatutory option on October 30, 2013 when Y stock is trading at more than $10 per share.*

The example mentions that the stock is trading at more than $10 per share, but the date of exercise is changed to October 30, 2013, which is less than 6 months from June 3, 2013. So the stock is higher when the ESOs were exercised and there would be a profit.

--------------------------------------------------------------------------

**Sentence 2**

*The shares acquired are subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b) through December 1, 2013.*

This is correct since the grant was considered a non exempt purchase matchable with a stock sale within 6 months when the stock was trading at a higher price. Thus there would be a deferring of income calculation and the tax liability until after December 1, 2013.  The income calculation and tax liability may occur sooner for some other reason. It must be emphasized that the terms of this example have probably never occurred in real life.

10

Below is Example 4(iii)

**(iii)** *Assume the same facts as in paragraph (i) of this Example 4 except that on November 5, 2013, Q also purchases 100 shares of Y common stock on the public market. The purchase of the shares is not a transaction exempt from section 16(b) of the Securities Exchange Act of 1934. Because no exemption from section 16(b) was available for the November 5, 2013 purchase of shares, the section 16(b) liability period with respect to such shares will last for a period of six months after the November 5, 2013 purchase of shares. Notwithstanding the non-exempt purchase of Y common stock on November 5, 2013, the shares acquired by Q pursuant to the December 15, 2013 exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b). As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.*

*(l) Effective/applicability date. This section applies to property transferred on or after January 1, 2013. For rules relating to property transferred before that date, see § 1.83-3 as contained in 26 CFR part 1 (as of April 1, 2012)*

## Sentence 1 and 2

*Assume the same facts as in paragraph (i) of this Example 4 except that on November 5, 2013, Q also purchases 100 shares of Y common stock on the public market. The purchase of the shares is not a transaction exempt from section 16(b) of the Securities Exchange Act of 1934.*

So it appears that the example will illustrate the results of two non exempt purchase transactions (i.e. the one which is the non-exempt grant of the ESOs, which rarely if ever happens and the non exempt purchase of shares in the market which occur regularly on a daily basis). The non exempt purchase on November 5, 2013 is within less than 6 months of the exercise of the ESOs on December 15,

**11**

2013 and the possible sale of stock on December 15, 2013 or after. But the non exempt grant of the ESOs is outside of 6 months of the exercise on December 15, 2013.

The Example intentionally omits the price of the stock purchased on November 5, 2013. Was the price less than $10, more than $10 or equal to $10. Was the price on November 5 greater the the price on December 15, 2013. It is therefore uncertain as to whether there could be a 16 b violation due to a matched sale of stock on December 15 or later.

-------------------------------------------------

## Sentence 3

*Because no exemption from section 16(b) was available for the November 5, 2013 purchase of shares, the section 16(b) liability period with respect such shares will last for a period of six months after the November 5, 2013 purchase of shares.*

This is clearly true.

-----------------------------------------------------------

## Sentence 4

*Notwithstanding the non-exempt purchase of Y common stock on November 5, 2013, the shares acquired by Q pursuant to the December 15, 2013 exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b).*

12

The above assumption can be based on one of several reasons.

a. The stock was purchased on a November 5, 2013 at a price equal to or greater than the price when the ESOs were exercised.
b. The person exercising the ESOs was no longer subject to 16 b of the 1934 Act on the day of exercise
c. Or for other reasons

### Sentence 5

*As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.*

The above result only applies to the facts in 4(iii)

However, let us assume that the grant of the ESOs was exempt from 16 b of the 1934 Act (which is the case in all or almost all cases) and the purchase price of the stock on Nov 5, 2013 was substantially below the stock price when the ESOs were exercised on December 15, 2013. Assume also that the person is subject to 16 b since he was an insider on December 15, 2016 and when the ESOs were granted.

Any sales of stock in the market on December 15, 2013 through May 3, 2014 at prices higher than the purchase price by a person still subject to 16 b of the 1934 Act makes the profit recoverable by the issuer. Thus any income calculation or tax liability due to the exercise is deferred until either the stock drops below the price at which the shares were bought on November 5, 2013 or the person is no longer subject to 16 b.

13

This analysis is confirmed by Judge Berzon of the Ninth Circuit Court of Appeals in Strom v. U.S. as illustrated in the verbatim quote:

BERZON, Circuit Judge:

*Ordinarily, when an employee is compensated with nonstatutory stock options that do not have a readily ascertainable fair market value at the time of the grant, the employee realizes income for tax purposes upon exercising the options.1 See 26 U.S.C. §§ 83(a) & (e)(3)-(e)(4); 26 C.F.R. § 1.83-7(a). The taxpayer is taxed on an amount equal to the fair market value of the stock on the date of exercise minus the option price paid for the stock. See 26 C.F.R. §1.83-1(a)(1); id. §1.83- 7(a)*

*Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3).*

*Section 16(b), in turn, forbids a corporate insider from profiting on a purchase made within six months of a sale (or a sale made within six months of a purchase) of the corporation's stock. See 15 U.S.C. § 78p(b). If a taxpayer is permitted to defer tax consequences under IRC § 83(c)(3), the taxpayer will be later taxed on an amount equal to the fair market value of the stock on the date that § 83(c)(3) no longer applies minus the option price paid for the stock. See 26 U.S.C. § 83(a); 26 C.F.R. § 1.83-1(a)(1).*

My words follow:

Strom v. U.S. is a case where the District Court in California ruled that the "vesting" of "exempt ESOs", granted over one year earlier, could be considered a purchase for 16 b purposes. The "vesting" was therefore matchable with a prospective sale of the shares received upon exercise of the exercise of the "exempt ESOs".

The Ninth Circuit reversed and ruled that the "vesting" was not considered a "purchase" and could not be matched with a prospective sale within less that six months following the vesting. Thus it was not possible for an exercise and sale to give rise for a 16 b suit.

14

In neither of the decisions was the grant even considered as a possible matchable purchase. The analysis was upon whether the "vesting" was the purchase. If the "vesting" was a purchase, the the District court was correct and the calculation of income and Strom's tax liability would have been deferred.

In this case of insiders _____, the grants of ESOs were exempt as in the Strom case and the District Court ruled the "vesting" was a non exempt purchase similar to a non exempt market purchase of stock and was matchable with a prospective sale.

The Ninth Circuit ruled that the "vesting' was not a purchase and did not defer the income calculation nor the tax liability because "*Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3)."*

And in Strom v. U.S. there was no purchase to be matched with the possible sale after vesting and exercise of ESOs.

But in this case before us now, there was clearly a purchase of stock within less than 6 months prior to the vesting of RSUs. The price for the purchased shares was lower than the stock price upon vesting on_____.

**Summary and Conclusion.**

*83 (c)(3) says the following:*

**Sales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934**

*So long as the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are—*

*(C)    subject to a substantial risk of forfeiture, and*

*(D)    not transferable.*

**15**

Below is the paragraph from an IRS Bulletin of March 17, 2014

*Specifically, practitioners asked whether the* **purchase of shares** *in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934* **prior to the exercise of a stock option** <span style="color:red">*that would not otherwise give rise to section 16(b) liability*</span> *would defer taxation of the stock option exercise. Treasury and the IRS do not believe that such a non-exempt purchase of shares would defer taxation of the subsequent stock option exercise. This result is consistent with Example 3 of § 1.83–3(j)(2). In response to these requests for clarification, Treasury and the IRS have revised Example 4 of proposed regulation § 1.83–3(j)(2) to address the situation raised."*

So the **purchase of shares** in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934 **prior to the exercise of a stock option** <span style="color:red">that would not otherwise give rise give rise to section 16(b) liability</span> **would not** defer taxation of the stock option exercise.

And the **purchase of shares** in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934 **prior to the exercise of a stock option** <span style="color:red">that could give rise to section 16(b) liability</span> **would** defer taxation of the stock option exercise.

This is exactly what the Ninth Circuit stated in Strom v. U.S. in the below quote:

*Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3).*

John Olagues

**16**

# Exhibit 4

John Olagues
413 Sauve Rd
River Ridge LA 70123
olagues@gmail.com
504- 305-4071

Stephen R. DiPrima
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, N.Y. 10019-6150

October 10, 2016

Dear Mr. DiPrima:

Attached are three documents:

1. A copy of the Form 4.com showing the transactions of Mr. Stephen Steinour President and CEO of Huntington Bancshares Inc.

2. A copy of an article of mine dealing with the application of IRC 83 (c)(3) to Section 16 b of the 1934 Securities Act of 1934. The article explains how income calculation and tax liability is deferred when sale of shares received from the vesting of RS and RSUs or shares are received when ESOs are exercised.

3. A Draft of a suit that will be filed unless we find a way to resolve this claim efficiently.

I believe you already have an article on why insiders must dispose of shares "automatically" if they wish an exemption from 16 b via Rule 16 b-3(e).

Please let me know whether there is a possibility of reaching an agreement to dispose of this claim or whether you prefer to have my claim decided in court.

Regards;

John Olagues

Home | Archives | Products | About | Contact | FAQ |    Welcome! Sign Out | My Account

# Sec Form 4

| | | | |
|---|---|---|---|
| Form 4 Filings | Insider Buys | Significant Buys | Penny Stocks Insider Buying |
| Insider Buy Sell Ratios | Stock Options | Insider Trading Stock Screener | Insider Trading Graph View |

Insider Sales

Insider Watch

## Sec Filings Insider Trading - Steinour Stephen D

Select Time period : 2 Years ⬍ Go!    C google    Y yahoo!

Send this page to: 🅑 Blog | 🔴 Digg | 🔴 Reddit | f Facebook | SU Stumble | ▪ del.icio.us

Enter Stock Ticker Symbol or Cik:          Search!    Cik Lookup...

Search By Company or Insider Name:          Search!    Google

"Insiders might sell their shares for any number of reasons, but they buy them for only one: they think the price will rise"
- Peter Lynch ==>> What is insider trading>>

✉ Email a friend >>...

Insider Trading - Steinour Stephen D
(c) http://www.secform4.com/

Total buys $1,820,394 , total sales $0 , net total $1,820,394
(Vertical in logarithmic scale. Chart based on reported date)

### Goto page 0, 1, Next

**Common stock purchase or sale:**

| Transaction Date | Reported Date | Company | Symbol | Insider Relationship | Shares Traded | Average Price | Total Amount | Shares Owned | Filing |
|---|---|---|---|---|---|---|---|---|---|
| 2016-03-14 Purchase | 2016-03-15 3:16 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 20,000 | $25 | $500,000 | 3,102,687 (Indirect) | View |
| 2016-03-02 Purchase | 2016-03-02 4:26 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 10,000 | $9.272 | $92,724 | 3,102,687 (Direct) | View |
| 2016-02-01 Purchase | 2016-02-01 1:16 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 100,000 | $8.571 | $857,064 | 3,092,873 (Direct) | View |
| 2015-04-22 Purchase | 2015-04-24 5:31 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 10,000 | $10.79 | $107,874 | 2,607,283 (Direct) | View |
| 2015-01-26 Purchase | 2015-01-27 2:58 pm | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 9,710 | $10.17 | $98,751 | 2,353,690 (Indirect) | View |
| 2014-10-21 Purchase | 2014-10-22 11:04 am | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 17,540 | $9.349 | $163,981 | 2,343,980 (Indirect) | View |

**Stock options: Exercise, Award, Grant, Conversion**

| Transaction Date | Reported Date | Exercisable Expiration | Company | Symnbol | Insider Relationship | Shares Traded | Conversion Price | Shares Owned | Filing |
|---|---|---|---|---|---|---|---|---|---|
| 2016-05-02 Option Award | 2016-05-04 4:19 pm | N/A N/A | L Brands Inc. | LB | Steinour Stephen D Director | 352 | $0 | 7,374 (Direct) | View |
| 2016-05-01 Tax Withholding | 2016-05-03 4:00 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 6,488 | $10.06 | 3,448,646 (Direct) | View |
| 2016-05-01 Option Award | 2016-05-03 4:00 pm | 2017-05-01 2026-05-01 | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 335,253 | $10.06 | 3,448,646 (Direct) | View |
| 2016-05-01 Option Award | 2016-05-03 4:00 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 168,737 | $0 | 3,448,646 (Direct) | View |
| 2016-04-20 Option Award | 2016-04-22 4:04 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 240,792 | $0 | 3,343,479 (Direct) | View |
| 2016-04-20 Tax Withholding | 2016-04-22 4:04 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 63,570 | $10.28 | 3,343,479 (Direct) | View |
| 2016-03-31 Option Award | 2016-04-04 5:32 pm | | L Brands Inc. | LB | Steinour Stephen D Director | 1,275 | $0 | 7,022 (Direct) | View |
| 2016-03-31 Option Award | 2016-04-01 4:38 pm | | Exelon Corp | EXC | Steinour Stephen D Director | 720 | $34.73 | 31,792 (Direct) | View |
| 2016-03-31 Option Award | 2016-04-01 4:38 pm | | Exelon Corp | EXC | Steinour Stephen D Director | 885 | $35.86 | 31,792 (Direct) | View |
| 2016-02-19 Tax Withholding | 2016-02-22 5:00 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 13,496 | $8.67 | 3,092,687 (Direct) | View |
| 2016-02-16 Option Award | 2016-02-18 4:03 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 45,766 | $0 | 3,109,760 (Direct) | View |
| 2016-02-16 Tax Withholding | 2016-02-18 4:03 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 3,577 | $8.77 | 3,109,760 (Direct) | View |
| 2016-02-11 Gift | 2016-02-16 5:38 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 25,975 | $0 | 3,063,994 (Direct) | View |
| 2016-02-11 | 2016-02-16 | | | | Steinour Stephen D | | | 3,063,994 | |

| Date / Type | Date/Time | Date 1 | Date 2 | Company | Symbol | Name / Title | Shares | Price | Holdings | |
|---|---|---|---|---|---|---|---|---|---|---|
| Tax Withholding | 5:38 pm | N/A | | Huntington Bancshares Inc | HBAN | President, CEO & Chairman | 2,904 | $8.005 | (Direct) | View |
| 2016-02-01 Option Award | 2016-02-03 1:12 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 290 | $0 | 5,581 (Direct) | View |
| 2015-12-31 Option Award | 2016-01-04 6:05 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 944 | $26.48 | 30,751 (Indirect) | View |
| 2015-12-31 Option Award | 2016-01-04 6:05 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 1,143 | $27.77 | 30,751 (Direct) | View |
| 2015-11-17 Exercise | 2015-11-18 09:28 am | 2010-01-14 2016-01-14 | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 250,000 | $4.95 | 3,168,563 (Direct) | View |
| 2015-11-17 Exercise | 2015-11-18 09:28 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 250,000 | $4.95 | 3,168,563 (Direct) | View |
| 2015-11-17 Tax Withholding | 2015-11-18 09:28 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 175,690 | $11.54 | 3,168,563 (Direct) | View |
| 2015-11-06 Exercise | 2015-11-09 09:19 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 250,000 | $4.95 | 3,093,941 (Direct) | View |
| 2015-11-06 Tax Withholding | 2015-11-09 09:19 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 175,378 | $11.6 | 3,093,941 (Direct) | View |
| 2015-11-06 Exercise | 2015-11-09 09:19 am | 2010-01-14 2016-01-14 | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 250,000 | $4.95 | 3,093,941 (Direct) | View |
| 2015-11-02 Option Award | 2015-11-04 4:25 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 290 | $0 | 5,265 (Direct) | View |
| 2015-09-30 Option Award | 2015-10-01 6:05 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 1,204 | $29.7 | 29,248 (Direct) | View |
| 2015-09-30 Option Award | 2015-10-01 6:05 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 840 | $29.75 | 29,248 (Indirect) | View |
| 2015-08-03 Option Award | 2015-08-05 11:33 am | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 340 | $0 | 4,947 (Direct) | View |
| 2015-06-30 Option Award | 2015-07-01 5:03 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 731 | $34.18 | 27,766 (Direct) | View |
| 2015-06-30 Option Award | 2015-07-01 5:03 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 1,138 | $31.42 | 27,766 (Indirect) | View |
| 2015-06-22 Exercise | 2015-06-23 10:32 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 500,000 | $4.95 | 3,195,322 (Direct) | View |
| 2015-06-22 Tax Withholding | 2015-06-23 10:32 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 351,381 | $11.54 | 3,195,322 (Direct) | View |
| 2015-06-22 Exercise | 2015-06-23 10:32 am | 2010-01-14 2016-01-14 | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 500,000 | $4.95 | 3,195,322 (Direct) | View |
| 2015-05-04 Option Award | 2015-05-04 4:32 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 309 | $0 | 4,580 (Direct) | View |
| 2015-05-01 Option Award | 2015-05-05 4:19 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 152,662 | $0 | 2,707,162 (Direct) | View |
| 2015-05-01 Tax Withholding | 2015-05-05 4:19 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 11,840 | $10.89 | 2,707,162 (Direct) | View |
| 2015-05-01 I | 2015-05-05 4:19 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 6,296 | $10.95 | 2,707,162 (Indirect) | View |
| 2015-05-01 Option Award | 2015-05-05 4:19 pm | 2016-05-01 2025-05-01 | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 277,237 | $10.89 | 2,707,162 (Direct) | View |
| 2015-04-22 Option Award | 2015-04-24 5:31 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 237,813 | $0 | 2,607,283 (Direct) | View |
| 2015-04-22 Tax Withholding | 2015-04-24 5:31 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 62,783 | $11.03 | 2,607,283 (Direct) | View |
| 2015-04-02 Option Award | 2015-04-06 2:04 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 1,198 | $0 | 4,271 (Direct) | View |
| 2015-03-31 Option Award | 2015-04-01 6:20 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 778 | $32.13 | 26,399 (Direct) | View |
| 2015-03-31 Option Award | 2015-04-01 6:20 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 945 | $33.61 | 26,399 (Indirect) | View |
| 2015-02-19 Tax Withholding | 2015-02-20 5:04 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 13,496 | $10.64 | 2,369,470 (Direct) | View |
| 2015-02-17 Option Award | 2015-02-19 9:32 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 32,177 | $0 | 2,382,966 (Direct) | View |
| 2015-02-11 Tax Withholding | 2015-02-12 6:22 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 2,901 | $10.5 | 2,350,789 (Direct) | View |
| 2015-02-02 Option Award | 2015-02-04 3:46 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 265 | $0 | 2,990 (Direct) | View |
| 2014-12-31 Option Award | 2015-01-05 11:56 am | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 1,001 | $37.08 | 25,210 (Direct) | View |
| 2014-12-31 Option Award | 2015-01-05 11:56 am | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 696 | $35.94 | 25,210 (Indirect) | View |
| 2014-11-03 Option Award | 2014-11-05 3:40 pm | N/A | | L Brands Inc. | LB | Steinour Stephen D Director | 310 | $0 | 2,714 (Direct) | View |
| 2014-09-30 Option Award | 2014-10-01 5:39 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 757 | $33.04 | 24,044 (Indirect) | View |
| 2014-09-30 Option Award | 2014-10-01 5:39 pm | N/A | | Exelon Corp | EXC | Steinour Stephen D Director | 929 | $34.09 | 24,044 (Direct) | View |
| 2014-08-19 Option Award | 2014-08-20 11:15 am | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 397 | $9.736 | 2,328,980 (Indirect) | View |
| 2014-08-15 Option Award | 2014-08-18 4:04 pm | N/A | | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 10,088 | $9.585 | 2,328,980 (Direct) | View |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2014-08-04 Option Award | 2014-08-06 4:34 pm | N/A N/A | L Brands Inc. | LB | Steinour Stephen D Director | 382 | $0 | 2,391 (Direct) | View |
| 2014-07-25 Tax Withholding | 2014-07-29 3:38 pm | N/A N/A | Huntington Bancshares Inc | HBAN | Steinour Stephen D President, CEO & Chairman Director | 19,400 | $9.98 | 2,328,980 (Direct) | View |
| 2014-07-14 Option Award | 2014-07-15 6:25 pm | N/A N/A | Exelon Corp | EXC | Steinour Stephen D Director | 61 | $32.89 | 22,911 (Direct) | View |
| 2014-07-01 Option Award | 2014-07-02 5:52 pm | N/A N/A | Exelon Corp | EXC | Steinour Stephen D Director | 1,049 | $35.7 | 22,857 (Direct) | View |

**Goto page 0, 1, Next**

© 2005-2016 SecForm4.Com All rights reserved.
Archives: 2016 2015 2014 2013 2012 2011 ...
Mon, 27 Jun 2016 08:23:09 -0500

SEC is the U.S. Securities and Exchange Commission. EDGAR is a trademark of the SEC.
SecForm4.Com is not affiliated with or approved by the U.S. Securities and Exchange Commission (SEC).
Terms of Use | Privacy Statement |

This article starts with the presentation of the statute 26 U.S. Code 83

### 26 U.S. Code § 83 - Property transferred in connection with performance of services

**(a)General rule**

*If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—*

**(1)**

*the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over*

**(2)**

*the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.*

-----------------------------------------------

My words follow:

So when Restricted Stock, RSUs and the like are transferred from the issuer company to an executive, the executive shall have the value of the stock received included in gross income when the shares vest in the executive if the shares are transferable and are not subject to a substantial risk of forfeiture.

1

And when ESOs and SARs and the like are transferred from the issuer company to an executive, the executive shall have the "intrinsic value" received upon exercising included in gross income if the shares received are transferable or are not subject to a substantial risk of forfeiture.

### 83 (c)(3) says the following:

**Sales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934**

*So long as the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are—*

(A)     *subject to a substantial risk of forfeiture, and*

(B)     *not transferable.*

My words follow:

This says clearly that when a sale of the stock received after vesting **which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934**, those shares are subject to a substantial risk of forfeiture, and not transferable. And the income calculation and the tax liability is deferred to when the sale of the stock will not give rise to suit under 16 b.

Below is the paragraph from an IRS Bulletin of March 17, 2014

*"Certain practitioners informally requested clarification regarding the application of section 83(c)(3) to a variation of the facts set forth in Example 4 of proposed regulation § 1.83–3(j)(2). Specifically, practitioners asked whether the **purchase of shares** in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934 **prior to the exercise of a stock option** that would not otherwise give rise to section 16(b) liability would defer taxation of the stock option exercise. Treasury and the IRS do not believe that such a non-exempt purchase of*

*2*

*shares would defer taxation of the subsequent stock option exercise. This result is consistent with Example 3 of § 1.83–3(j)(2). In response to these requests for clarification, Treasury and the IRS have revised Example 4 of proposed regulation § 1.83–3(j)(2) to address the situation raised."*

**Below is a 100% Precise Interpretation of the paragraph above.**

The paragraph above means that if an insider buys non exempt shares 3 months prior to an exercise of non exempt NQESO that would not otherwise give rise to section 16(b) liability, this would not defer taxation of the income from the stock option exercise.

However, if the non exempt purchase of the shares was 3 months prior to the exercise of NQESOs and those transactions would give rise to a section 16 (b) liability upon a sale of stock at a profit from the share price 3 months earlier, this would defer taxation of the exercise for 3 months. However: if the stock received from the exercise traded lower than the purchase price 3 months before the exercise, the tax liability would occur on the day that the stock traded lower.

There are attorneys who try to promote the idea that IRC 83(c)(3) seldom if ever applies. They refer to the Examples 4(i),(ii),(iii)( from the IRS on Jan 31, 2014 from Federal Register and A Rule by the IRS on 2/26/2014) in support of the idea that the only time that IRC 83 (c)(3) applies is when the original grant of ESOs, SARs, Restricted stock or RSUs is not exempt from 16 b and is considered the matchable purchase with the possible subsequent sale of stock received from the exercise of ESOs or SARs or vesting of Restricted Stock or RSUs.

In my history with grants of ESOs, I have never seen a grant of ESOs that was not exempt or not exempt and immediately exercisable. I have never seen a grant of Restricted stock that was not exempt from 16 b.

3

Perhaps one grant in 10,000 grants is non exempt from 16 b of the 1934 Act.

So let's analyse these Examples 4 (i),(ii), and (iii) starting with Example 4(i) below:

*(i) On June 3, 2013, Y corporation grants to Q, an officer of Y, a nonstatutory option to purchase Y common stock. Y stock is traded on an established securities market. Although the option is immediately exercisable, it has no readily ascertainable fair market value when it is granted. Under the option, Q has the right to purchase 100 shares of Y common stock for $10 per share, which is the fair market value of a Y share on the date of grant of the option. The grant of the option is not one that satisfies the requirements for a transaction that is exempt from section 16(b) of the Securities Exchange Act of 1934. On December 15, 2013, Y stock is trading at more than $10 per share.  On that date, Q fully exercises the option, paying the exercise price in cash, and receives 100 Y shares. Q's rights in the shares received as a result of the exercise are not conditioned upon the future performance of substantial services. Because no exemption from section 16(b) was available for the June 3, 2013 grant of the option, the section 16(b) liability period expires on December 1, 2013. Accordingly, the section 16(b) liability period expires before the date that Q exercises the option and the Y common stock is transferred to Q. Thus, the shares acquired by Q pursuant to the exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b). As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.*

4

## Sentence 1

*On June 3, 2013, Y corporation grants to Q, an officer of Y, a nonstatutory option to purchase Y common stock.*

------------------------------------------------------

Most ESOs are nonstatutory, perhaps 95 % are. Nonstatutory ESOs are ones where the taxable income when the ESOs are exercised equals the "intrinsic value" of the ESOs when exercised and the stock received is transferable and not subject to being forfeited. See IRC 83(c)(3) below:

**(3)Sales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934**

So long as the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are

A: subject to a substantial risk of forfeiture, and

B: not transferable.

------------------------------------------------------------------

5

## Sentence 2

*Y stock is traded on an established securities market.*

This means the shares received from exercises or vesting have a market where shares received can be sold reasonably easily

---------------------------------------------------------------------------

## Sentence 3

*Although the option is immediately exercisable, it has no readily ascertainable fair market value when it is granted.*

This means that it is assumed that the options can be exercised anytime from the first day it was granted (which is quite rare) and there is no ascertainable fair market value when granted. Thus it is not taxed on the grant day.

-------------------------------------------------------

## Sentence 4.

*Under the option, Q has the right to purchase 100 shares of Y common stock for $10 per share, which is the fair market value of a Y share on the date of grant of the option.*

Generally ESOs are granted with an exercise price equal to the current market value. In this example the exercise price is set at $10.00 which is the market value on the grant day.

------------------------------------------------------------

**6**

## Sentence 5

*The grant of the option is not one that satisfies the requirements for a transaction that is exempt from section 16(b) of the Securities Exchange Act of 1934.*

This means that the grant of the ESOs can be deemed a purchase matchable to a sale for 16 b purposes.

------------------------------------------------------------

## Sentence 6 and 7

*On December 15, 2013, Y stock is trading at more than $10 per share. On that date, Q fully exercises the option, paying the exercise price in cash, and receives 100 Y shares.*

This sentence means that the exercise on December 15, 2013 is outside of six months from the grant of the ESOs and the sale of any stock received by the exercise of the ESOs can not be matched for 16 b purposes with the grant of the non exempt purchase on June 3, 2013 even though the shares are trading above the exercise price.

------------------------------------------------

## Sentence 8

*Q's rights in the shares received as a result of the exercise are not conditioned upon the future performance of substantial services.*

This means that generally the "intrinsic value" equals taxable income upon exercise.

7

-------------------------------------------------------

### Sentence 9 and 10

*Because no exemption from section 16(b) was available for the June 3, 2013 grant of the option, the section 16(b) liability period expires on December 1, 2013. Accordingly, the section 16(b) liability period expires before the date that Q exercises the option and the Y common stock is transferred to Q.*

These sentences are accurate but they do not mention that the grants of ESOs are almost always exempt from 16 b. Thus the grants can very rarely if ever be matched with a sale of any stock or derivative. So when does the 16 b liability period expire, if the grants of the ESOs are exempt from section 16 b?

The question becomes "why did the IRS give an example of something that has probably never happened?" to illustrate the meaning of IRC 83 (c)(3).

-------------------------------------------------------

### Sentence 11

*Thus, the shares acquired by Q pursuant to the exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b).*

This is true because of the fact that more than 6 months have passed from the grant on June 3, 2013, although the shares were trading at a price higher than $10.00 , when the exercise of the non exempt ESOs took place.

-------------------------------------------

8

## Sentence 12

*As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.*

This conclusion is correct under the assumptions above.

-----------------------------------------------------------------------------------

We now turn to Example 4(ii) which is below:

**(ii)** *Assume the same facts as in paragraph (i) of this Example 4 except that Q exercises the nonstatutory option on October 30, 2013 when Y stock is trading at more than $10 per share. The shares acquired are subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b) through December 1, 2013.*

## Sentence 1

*Assume the same facts as in paragraph (i) of this Example 4 except that Q exercises the nonstatutory option on October 30, 2013 when Y stock is trading at more than $10 per share.*

The example mentions that the stock is trading at more than $10 per share, but the date of exercise is changed to October 30, 2013, which is less than 6 months from June 3, 2013. So the stock is higher when the ESOs were exercised and there would be a profit.

------------------------------------------------------------------------

## Sentence 2

*The shares acquired are subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b) through December 1, 2013.*

This is correct since the grant was considered a non exempt purchase matchable with a stock sale within 6 months when the stock was trading at a higher price. Thus there would be a deferring of income calculation and the tax liability until after December 1, 2013. The income calculation and tax liability may occur sooner for some other reason. It must be emphasized that the terms of this example have probably never occurred in real life.

10

Below is Example 4(iii)

*(iii) Assume the same facts as in paragraph (i) of this Example 4 except that on November 5, 2013, Q also purchases 100 shares of Y common stock on the public market. The purchase of the shares is not a transaction exempt from section 16(b) of the Securities Exchange Act of 1934. Because no exemption from section 16(b) was available for the November 5, 2013 purchase of shares, the section 16(b) liability period with respect to such shares will last for a period of six months after the November 5, 2013 purchase of shares. Notwithstanding the non-exempt purchase of Y common stock on November 5, 2013, the shares acquired by Q pursuant to the December 15, 2013 exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b). As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.*

*(l) Effective/applicability date. This section applies to property transferred on or after January 1, 2013. For rules relating to property transferred before that date, see § 1.83-3 as contained in 26 CFR part 1 (as of April 1, 2012)*

## Sentence 1 and 2

*Assume the same facts as in paragraph (i) of this Example 4 except that on November 5, 2013, Q also purchases 100 shares of Y common stock on the public market. The purchase of the shares is not a transaction exempt from section 16(b) of the Securities Exchange Act of 1934.*

So it appears that the example will illustrate the results of two non exempt purchase transactions (i.e. the one which is the non-exempt grant of the ESOs, which rarely if ever happens and the non exempt purchase of shares in the market which occur regularly on a daily basis). The  non exempt purchase on November 5, 2013 is within less than 6 months of the exercise of the ESOs on December 15,

11

2013 and the possible sale of stock on December 15, 2013 or after. But the non exempt grant of the ESOs is outside of 6 months of the exercise on December 15, 2013.

The Example intentionally omits the price of the stock purchased on November 5, 2013. Was the price less than $10, more than $10 or equal to $10. Was the price on November 5 greater the the price on December 15, 2013. It is therefore uncertain as to whether there could be a 16 b violation due to a matched sale of stock on December 15 or later.

-------------------------------------------------------

## Sentence 3

*Because no exemption from section 16(b) was available for the November 5, 2013 purchase of shares, the section 16(b) liability period with respect to such shares will last for a period of six months after the November 5, 2013 purchase of shares.*

This is clearly true.

---------------------------------------------------------------

## Sentence 4

*Notwithstanding the non-exempt purchase of Y common stock on November 5, 2013, the shares acquired by Q pursuant to the December 15, 2013 exercise of the option are not subject to a substantial risk of forfeiture under section 83(c)(3) as a result of section 16(b).*

**12**

The above assumption can be based on one of several reasons.

a. The stock was purchased on a November 5, 2013 at a price equal to or greater than the price when the ESOs were exercised.
b. The person exercising the ESOs was no longer subject to 16 b of the 1934 Act on the day of exercise
c. Or for other reasons

## Sentence 5

*As a result, section 83(c)(3) does not preclude taxation under section 83 when the shares acquired pursuant to the December 15, 2013 exercise of the option are transferred to Q.*

The above result only applies to the facts in 4(iii)

However, let us assume that the grant of the ESOs was exempt from 16 b of the 1934 Act (which is the case in all or almost all cases) and the purchase price of the stock on Nov 5, 2013 was substantially below the stock price when the ESOs were exercised on December 15, 2013. Assume also that the person is subject to 16 b since he was an insider on December 15, 2016 and when the ESOs were granted.

Any sales of stock in the market on December 15, 2013 through May 3, 2014 at prices higher than the purchase price by a person still subject to 16 b of the 1934 Act makes the profit recoverable by the issuer. Thus any income calculation or tax liability due to the exercise is deferred until either the stock drops below the price at which the shares were bought on November 5, 2013 or the person is no longer subject to 16 b.

13

This analysis is confirmed by Judge Berzon of the Ninth Circuit Court of Appeals in Strom v. U.S. as illustrated in the verbatim quote:

BERZON, Circuit Judge:

*Ordinarily, when an employee is compensated with nonstatutory stock options that do not have a readily ascertainable fair market value at the time of the grant, the employee realizes income for tax purposes upon exercising the options.1 See 26 U.S.C. §§ 83(a) & (e)(3)-(e)(4); 26 C.F.R. § 1.83-7(a). The taxpayer is taxed on an amount equal to the fair market value of the stock on the date of exercise minus the option price paid for the stock. See 26 C.F.R. §1.83-1(a)(1); id. §1.83- 7(a)*

*Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3).*

*Section 16(b), in turn, forbids a corporate insider from profiting on a purchase made within six months of a sale (or a sale made within six months of a purchase) of the corporation's stock. See 15 U.S.C. § 78p(b). If a taxpayer is permitted to defer tax consequences under IRC § 83(c)(3), the taxpayer will be later taxed on an amount equal to the fair market value of the stock on the date that § 83(c)(3) no longer applies minus the option price paid for the stock. See 26 U.S.C. § 83(a); 26 C.F.R. § 1.83-1(a)(1).*

My words follow:

Strom v. U.S. is a case where the District Court in California ruled that the "vesting" of "exempt ESOs", granted over one year earlier, could be considered a purchase for 16 b purposes. The "vesting" was therefore matchable with a prospective sale of the shares received upon exercise of the exercise of the "exempt ESOs".

The Ninth Circuit reversed and ruled that the "vesting" was not considered a "purchase" and could not be matched with a prospective sale within less that six months following the vesting. Thus it was not possible for an exercise and sale to give rise for a 16 b suit.

**14**

In neither of the decisions was the grant even considered as a possible matchable purchase. The analysis was upon whether the "vesting" was the purchase. If the "vesting" was a purchase, the the District court was correct and the calculation of income and Strom's tax liability would have been deferred.

In this case of insiders _____, the grants of ESOs were exempt as in the Strom case and the District Court ruled the "vesting" was a non exempt purchase similar to a non exempt market purchase of stock and was matchable with a prospective sale.

The Ninth Circuit ruled that the "vesting' was not a purchase and did not defer the income calculation nor the tax liability because "*Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3)."*

And in Strom v. U.S. there was no purchase to be matched with the possible sale after vesting and exercise of ESOs.

But in this case before us now, there was clearly a purchase of stock within less than 6 months prior to the vesting of RSUs. The price for the purchased shares was lower than the stock price upon vesting on_____.

**Summary and Conclusion.**

*83 (c)(3) says the following:*

*Sales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934*

*So long as the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are—*

*(C)     subject to a substantial risk of forfeiture, and*

*(D)     not transferable.*

**15**

Below is the paragraph from an IRS Bulletin of March 17, 2014

*Specifically, practitioners asked whether the* **purchase of shares** *in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934* **prior to the exercise of a stock option** that would not otherwise give rise to section 16(b) liability *would defer taxation of the stock option exercise. Treasury and the IRS do not believe that such a non-exempt purchase of shares would defer taxation of the subsequent stock option exercise. This result is consistent with Example 3 of § 1.83–3(j)(2). In response to these requests for clarification, Treasury and the IRS have revised Example 4 of proposed regulation § 1.83–3(j)(2) to address the situation raised."*

So the **purchase of shares** in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934 **prior to the exercise of a stock option** that would not otherwise give rise give rise to section 16(b) liability **would not** defer taxation of the stock option exercise.

And the **purchase of shares** in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934 **prior to the exercise of a stock option** that could give rise to section 16(b) liability **would** defer taxation of the stock option exercise.

This is exactly what the Ninth Circuit stated in Strom v. U.S. in the below quote:

*Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3).*

John Olagues

UNITED STATES DISTRICT COURT
DISTRICT OF OHIO


John A. Olagues, Pro Se
A shareholder of Huntington Bancshares Inc


       Plaintiff                    Private Right of Action
                                         Under Section 16 b of the
                                         Securities Act of 1934
                                         CIVIL ACTION NO.
       Versus

Stephen D. Steinour, CEO and Chairman
Of Huntington Bancshares Inc  and
Huntington Bancshares Inc


       Defendants

<u>COMPLAINT</u>
<u>JURY TRIAL DEMANDED</u>

1.  Plaintiff, alleges, based upon knowledge with respect to the facts relating
   to him upon information and belief with respect to all other allegations, as follows:

<u>INTRODUCTION</u>

2. This action is brought pursuant to Section 16(b) of the Securities Exchange Act of
1934, as amended (the "Exchange Act"), [15 U.S.C. 78p(b)] ("Section 16(b)") in order
to recover short-swing insider trading profits realized by defendant Stephen Steinour
while he was statutory insider and CEO and Chairman of Huntington Bancshares Inc.

3.  Stephen Steinour at all relevant times was an officer of Huntington Inc. within the
meaning of Section 16(b).

1

4. Section 16(b) requires company insiders to disgorge any profits earned by Section 16 (b) insiders through short-swing insider trading (i.e., purchases and sales, or sales and purchases, of the company's securities, within less than a six month period). Actual misuse of inside information is not an element of the claim although the statute embodies a presumption that statutory insiders have access to such inside information.

### PARTIES

- Plaintiff , John Olagues is a shareholder of Huntington Bancshares Inc

- Defendant, Stephen Steinour is an the CEO and Chairman of Huntington Bancshares Inc.

- Defendant, Huntington Bancshares Inc .


5. Huntington Bancshares Inc , Common Stock is registered with the SEC pursuant to Section 12 of the Exchange Act and the Common Stock trades on the NASDAQ and NYSE under the symbol HBAN .

6. Huntington Bancshares Inc. is a necessary party as this action is brought by Plaintiff in order to obtain a recovery for the firm, Huntington Bancshares Inc  Inc.

### JURISDICTION AND VENUE

7. Jurisdiction of this Court is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa].

8. Venue is properly laid in this District because Defendant Stephen Steinour is located in this District.

2

<u>SUBSTANTIVE ALLEGATIONS</u>

9. The transactions shown on Form 4s filed with the SEC by Mr. Steinour are listed below: The attached Document from SEC Form 4.com shows all of the relevant filings by Mr. Steinour, who was the CEO and Chairman when the purchases and disposition were made.

| Shares Purchased | Date | Price | Shares Disposed | Date | Price | Profit |
|---|---|---|---|---|---|---|
| 10,000 | 3/2/2016 | $9.27 | 10,000 | 11/6/2015 | $11.60 | $23,300 |
| 100,000 | 2/1/2016 | $8.57 | 100,000 | 11/6/2015 | $11.60 | $303,000 |
| 10,000 | 4/22/2015 | $10.79 | 10,000 | 6/22/2015 | $11.54 | $7500 |
| 9,710 | 1/26/2015 | $10.17 | 9,710 | 6/22/2015 | $11.54 | $13,302 |
| 13,496 | 10/21/2014 | $9.35 | 13,496 | 2/19/2015 | $10.64 | $17,409 |
| 2,901 | 10/21/2014 | $9.35 | 2,910 | 2/11/2015 | $10.50 | $3,336 |

Total profits………………………. $367,847

None of the dispositions to the issuer were "automatic" as required to achieve an exemption under 16 b-3(e)

Dispositions of shares for tax withholding on 6 different dates were premature under IRC 83(c)(3) and there can be no approval of dispositions of shares for taxes when income calculation has been deferred and no tax liability has been assessed. Of the $367,847 of recoverable profits, Approximately $160,000 in matched profits could have come from matched premature share dispositions for taxes, where the income calculation and the tax liability was deferred.

10. All of the Shares Purchased above were market transactions non exempt from section 16 b. This is conceded by attorneys for defendants.

3

## BASIS FOR INFORMATION AND BELIEF

11. Plaintiff's information and belief is based on, among other things, the SEC Form 4s referenced herein and the violations of the Securities law as described above. Also the SEC Staff opinion expressed in the Q and A, No.123.16 of May 23, 2007 support Plaintiff's view that dispositions must be automatic with no discretion to the issuer.

## ALLEGATIONS AS TO DEMAND

12. Plaintiff notified Huntington Bancshares Inc of the facts alleged above (the "Demand"). Attorneys for Huntington Bancshares Inc. refused to request disgorgement of the profits from Mr. Steinour and refused to file suit to recover such profits totaling $367,847, after 60 days have passed from the 60 day notices were received by Huntington Bancshares Inc.

13. The attorneys for Huntington Bancshares in a letter to Plaintiff, alleged that the dispositions from Mr. Steinour to Huntington Bancshares Inc were exempt from Section 16 b of the 1934 Act via SEC Rule 16 b-3(e) and thus the attorneys alleged that the dispositions from 2/21/2015 through 11/6/2015 could not be matched with any of the purchases between 10/21/2014 and 3/12/2016.

14. Plaintiff claims that there was no proper approval of the dispositions from Mr. Steinmark to Huntington Bancshares Inc and thus no exemptions from Section 16 b of the 1934 Securities Act by way of SEC Rule 16 b-3(e).

4

<u>PRAYER FOR RELIEF</u>

14. WHEREFORE, Plaintiff prays for judgment against Defendant Mr. Stephen Steinour in an amount to be determined at trial, plus prejudgment interest, post-judgment interest and such other and further relief as this Court may deem just and proper.

15. The amount to be at a minimum of $ 367,847 which is the total profit received from non exempt purchases and non exempt dispositions.

DATED this 10 th day of October, 2016.

Respectfully Submitted

John Olagues

5

# Exhibit 5

## WACHTELL, LIPTON, ROSEN & KATZ

51 WEST 52ND STREET

NEW YORK, N.Y. 10019-6150

TELEPHONE: (212) 403-1000

FACSIMILE: (212) 403-2000

MARTIN LIPTON
HERBERT M. WACHTELL
PAUL VIZCARRONDO, JR.
PETER C. HEIN
HAROLD S. NOVIKOFF
THEODORE N. MIRVIS
EDWARD D. HERLIHY
DANIEL A. NEFF
ANDREW R. BROWNSTEIN
PAUL K. ROWE
MARC WOLINSKY
DAVID GRUENSTEIN
STEVEN A. ROSENBLUM
JOHN F. SAVARESE
SCOTT K. CHARLES
JODI J. SCHWARTZ
ADAM O. EMMERICH
GEORGE T. CONWAY III
RALPH M. LEVENE
RICHARD G. MASON
MICHAEL J. SEGAL

DAVID M. SILK
ROBIN PANOVKA
DAVID A. KATZ
ILENE KNABLE GOTTS
JEFFREY M. WINTNER
TREVOR S. NORWITZ
BEN M. GERMANA
ANDREW J. NUSSBAUM
RACHELLE SILVERBERG
STEVEN A. COHEN
DEBORAH L. PAUL
DAVID C. KARP
RICHARD K. KIM
JOSHUA R. CAMMAKER
MARK GORDON
JOSEPH D. LARSON
LAWRENCE S. MAKOW
JEANNEMARIE O'BRIEN
WAYNE M. CARLIN
STEPHEN R. DiPRIMA
NICHOLAS G. DEMMO

IGOR KIRMAN
JONATHAN M. MOSES
T. EIKO STANGE
DAVID A. SCHWARTZ
JOHN F. LYNCH
WILLIAM SAVITT
ERIC M. ROSOF
MARTIN J.E. ARMS
GREGORY E. OSTLING
DAVID B. ANDERS
ANDREA K. WAHLQUIST
ADAM J. SHAPIRO
NELSON O. FITTS
JOSHUA M. HOLMES
DAVID E. SHAPIRO
DAMIAN G. DIDDEN
IAN BOCZKO
MATTHEW M. GUEST
DAVID E. KAHAN
DAVID K. LAM
BENJAMIN M. ROTH

JOSHUA A. FELTMAN
ELAINE P. GOLIN
EMIL A. KLEINHAUS
KARESSA L. CAIN
RONALD C. CHEN
GORDON S. MOODIE
DONGJU SONG
BRADLEY R. WILSON
GRAHAM W. MELI
GREGORY E. PESSIN
CARRIE M. REILLY
MARK F. VEBLEN
VICTOR GOLDFELD
EDWARD J. LEE
BRANDON C. PRICE
KEVIN S. SCHWARTZ
MICHAEL S. BENN
SABASTIAN V. NILES
ALISON ZIESKE PREISS

GEORGE A. KATZ (1965-1989)
JAMES H. FOGELSON (1967-1991)
LEONARD M. ROSEN (1965-2014)

OF COUNSEL

WILLIAM T. ALLEN
MICHAEL H. BYOWITZ
PETER C. CANELLOS
DAVID M. EINHORN
KENNETH B. FORREST
THEODORE GEWERTZ
MAURA R. GROSSMAN
RICHARD D. KATCHER
MEYER G. KOPLOW
DOUGLAS K. MAYER
ROBERT B. MAZUR
PHILIP MINDLIN
ROBERT M. MORGENTHAU
DAVID M. MURPHY

DAVID S. NEILL
BERNARD W. NUSSBAUM
LAWRENCE B. PEDOWITZ
ERIC S. ROBINSON
PATRICIA A. ROBINSON*
ERIC M. ROTH
MICHAEL W. SCHWARTZ
STEPHANIE J. SELIGMAN
ELLIOTT V. STEIN
WARREN R. STERN
PATRICIA A. VLAHAKIS
ANTE VUCIC
AMY R. WOLF

* ADMITTED IN THE DISTRICT OF COLUMBIA

COUNSEL

DAVID M. ADLERSTEIN
AMANDA K. ALLEXON
LOUIS J. BARASH
FRANCO CASTELLI
DIANNA CHEN
ANDREW J.H. CHEUNG
PAMELA EHRENKRANZ
UMUT ERGUN
KATHRYN GETTLES-ATWA
ADAM M. GOGOLAK

PAULA N. GORDON
NANCY B. GREENBAUM
MARK A. KOENIG
LAUREN M. KOFKE
J. AUSTIN LYONS
ALICIA C. McCARTHY
AMANDA N. PERSAUD
S. CHRISTOPHER SZCZERBAN
JEFFREY A. WATIKER

DIRECT DIAL: (212) 403-1382
DIRECT FAX: (212) 403-2382
E-MAIL: SRDiPrima@wlrk.com

November 3, 2016

## VIA FEDERAL EXPRESS

John Olagues
413 Sauve Road
River Ridge, LA 70123

      Re:    Huntington Bancshares Inc.

Dear Mr. Olagues:

        We write in response to your various letters seeking to resolve your allegations relating to the application of Section 16(b) to certain dispositions of Huntington stock by Stephen Steinour. We do not intend to engage in such discussions. We disagree with your position, and we do not believe that your request for a fee for your "consulting services" in exchange for your agreement not to pursue litigation is appropriate. *See Klein* v. *Salvi*, 2004 WL 596109, at *1 (S.D.N.Y. Mar. 30, 2004) ("Successful plaintiffs in section 16(b) suits are not personally entitled to receive any portion of the recovered damages.").

        Sincerely,

*Stephen R. DiPrima*

Stephen R. DiPrima

cc:    Richard A. Cheap, Executive Vice President and General Counsel (by email)

# Exhibit 6

John Olagues
413 Sauve Rd
River Ridge LA 70123
olagues@gmail.com
504-305-4071

Stephen R. DiPrima
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, N.Y. 10019-6150

November 6, 2016

 Dear Mr. Stephen R. DiPrima:

I have received your letter of November 3, 2016, where you again say that you disagree with my position regarding the liability of Mr. Stephen Steinour to disgorge profits from his dispositions to Huntington Bancshares that are matched with purchases within less than 6 months. The question is whether the dispositions are exempt or not exempt from Section 16 b via SEC Rule 16 b-3(e).

The large majority of his dispositions to the issuer, Huntington Bancshares, include delivering part of the stock received by Mr. Steinmore from exercising ESOs, which was used to pay for the exercise price of the ESOs and the possible tax liability on the intrinsic value of the ESOs, when the income is calculated and the tax liability is assessed.

For example Mr. Steinour exercised 500,000 ESOs on 6/22/2015, which had an expiration date of 1/14/2016. The exercise was 6 months and 2 weeks early at his discretion. He paid the exercise price of $4.95 on 500,000 shares of stock and paid for a premature tax liability on income which was not yet assessed by delivering 351,381 shares to Huntington Bancshares on 6/22/2015.

Mr. Steinour also did the same on 11/17/2015 and 11/6/2016 where the total exercises were 500,000 and payment for the exercise price and premature taxes resulted in a discretionary reduction in his long stock position by 70%.

Below is the paragraph which governs the method of the payment for the exercise price. It may be paid in cash or its equivalent or by tendering shares or a combination of the methods. I can not find anything in any document which gives Huntington discretion to reject his choice of method or the timing of the exercise and disposition of shares.

1

*5.05 **Exercise Procedures and Payment for Options.** Except as otherwise provided in the Plan or in a related Award Agreement, an Option may be exercised for all or any portion of the Shares for which it is then exercisable.*

*An Option shall be exercised by the delivery of a notice of exercise to the Company or its designee in a form specified by the Committee which sets forth the number of Shares with respect to which the Option is to be exercised and full payment of the exercise price for such Shares.*

*The exercise price of an Option may be paid:*
*(a) in cash or its equivalent;*

*(b) by tendering (either by actual delivery or attestation) previously acquired Shares having an aggregate Fair Market Value at the time of exercise equal to the aggregate exercise price; provided that such Shares had been held for at least six months or such other period required to obtain favorable accounting treatment and to comply with the requirements of Section 16 of the Act;*

*(c) by a cashless exercise (including by withholding Shares deliverable upon exercise and through a broker-assisted arrangement to the extent permitted by applicable law);*

*(d) by a combination of the methods described in clauses (a), (b) and/or (c); or (e) though any other method approved by the Committee in its sole discretion. As soon as practicable after receipt of the notification of exercise and full payment of the exercise price, the Company shall cause the appropriate number of Shares to be issued to the Participant.*

-----------------------------------

So the insider, Mr. Steinour, chose to pay with shares for the exercise price and for any taxes. And the issuer was required to accept that payment in shares. As a result of his choice to pay with shares instead of cash, his equivalent long position in the stock from holding the ESOs was reduced by 70%.

2

Below is a graph showing the stock movements at the time of the 70% reduction on 6/22/2015.



Below is a graph showing the stock movements at the time of the 70% reduction on 11/6/2015 and 11/17/2015.





Below is the two year graph of the movement of the stock price showing the dramatic drop from $11.6 and $11.54 on 11/6/2015 and 11/17/2015 to below $8 near the end of January in 2016.



Below is a graph showing the stock movement when he bought 100,000 shares on 2/1/ 2016 with the stock advancing shortly afterwards by 25% after 3 months.



4

Below is a full copy of Section 16( b) with emphasis highlighted

*"(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months.*

*Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized.*

*This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement or a security-based swap involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."*
-----------------------------------------------

The stock disposition for the exercise price and taxes would be exempt from Section 16 b via SEC Rule 16 b-3(e), if the terms were approved by Huntington as required by 16 b (3)(d) 1 and 2 and Note (3) and the transaction was not " comprehended within the purpose of this subsection". The SEC can not pass a rule exempting transactions that are *"comprehended within the purpose of this subsection." (i.e. Section 16 b).*

Below is SEC Rule 16 b-3(e). The sentences in red are my analysis and comments. I have highlighted the parts of the Rules and note (3) that are pertinent to our case here.

5

**SEC Rule 16 b-3(e)**

**(e)** *Dispositions to the issuer.* Any transaction, other than a Discretionary Transaction, involving the disposition to the issuer of issuer equity securities, whether or not intended for a compensatory or other particular purpose, shall be exempt, provided that the terms of such disposition are approved in advance in the manner prescribed by either paragraph (d)(1) or paragraph (d)(2) of this section.

The **terms** of of each disposition must be approved in advance as in paragraph 1 of SEC Rule 16 b-3(d)(1) below.

Below is
 **SEC Rule 16 b-3(d)(1) and (2**).... approval highlighted.

**(d)** *Acquisitions from the issuer.* Any transaction, other than a Discretionary Transaction, involving an acquisition from the issuer (including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose, shall be exempt if:

**(1)** The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors;

**(2)** The transaction is approved or ratified, in compliance with section 14 of the Act, by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; *provided that* such ratification occurs no later than the date of the next annual meeting of shareholders; or

Below is Note (3) which explains 16 b-3(d) and 16 b-3(e).

**Note (3):**
The approval conditions of paragraphs (d)(1), (d)(2) and (e) of this section require the approval of **each specific transaction**, and are not satisfied by approval of a plan in its entirety except for the approval of a plan pursuant to which the **terms** and conditions of **each transaction** are fixed in advance, such as a formula plan. Where the **terms** of a subsequent transaction (such as the exercise price of an option, or the provision of an exercise or tax withholding right) are provided for in a transaction as initially approved pursuant to paragraphs (d)(1), (d)(2) or (e), such subsequent transaction shall not require further specific approval.

6

The approval requires the approval of each specific transaction and is not satisfied by the plan itself unless the **terms** and conditions of each specific transaction are fixed in advance.

Other than the exercise price and the expiration date, there is no such approval of the **terms** of any specific transaction either in the plan or later by a Compensation committee or the Board. The **terms** of the exercise price and the expiration date are approved, but the date of the exercise and the amount of shares disposed of to the issuer, if any, did not get any proper approval. The **terms** of the disposition of the shares to the issuer for the exercise price and the tax liability was 100% up to the discretion of the insider, Mr. Steinour.

In fact there was no tax liability at the time of the exercise of a substantial part of the shares as IRC 83 (c)(3) deferred the income calculation and tax liability. See Strom v. US Ninth Circuit 2011.

 Romeo and Dye say the following:

**(6) Issuer Discretion To Disallow Stock Withholding, Surrender, Or Delivery May Call Into Question Availability Of Rule 16b-3(e)**. The staff (of the SEC) has taken the position that a net exercise or tax withholding transaction that is subject to issuer discretion would require specific approval of individual transaction in order for the Rule 16b-3(e) exemption to be available.

See *Compliance and Disclosure Interpretations, Exchange Act Section 16 and Related Rules and Forms*, Q. 123.16 (May 23, 2007). Apparently the staff is concerned that the issuer's discretion means the board or committee delegated to management the decision whether to approve withholding, rather than making the decision itself.

 Issuers might consider assuring the availability of the exemption by
 (i) eliminating the discretionary feature and making the right entirely elective on the part of the insider,

(ii) having the administering committee adopt a resolution providing that withholding is permissible unless the committee (not management) concludes that it should not be permitted in a particular case, or

(iii) having the committee establish clear guidelines for management's disallowance of withholding, so that the decision by management is ministerial rather than discretionary. For a more detailed discussion of the staff's position, see the June 2008 issue of *Section 16 Updates* at p. 8.

SEC Division of Corporation Finance

**Manual of Publicly Available Telephone Interpretations is below**

R. SECTION 16 RULES AND FORMS 3, 4 AND 5

----------------Some telephone statements by the SEC ------------

**** Rule 16b-3(e), Note 3 **** Board approval of a buy-back plan providing for the issuer to buy back option shares at any time at fair market value would not satisfy the approval requirement of Rule 16b-3(e) because the resultant open-ended buy-back transactions would not have been approved with sufficient specificity. 49. ****

Rule 16b-3(e), Note 3; Rule 16b-3(d) **** Approval of a grant which by its terms provides for **automatic** reloads would satisfy specificity of approval requirements under Rule 16b-3(d) for the reload grants, unless the **automatic** reload feature permitted the reload grants to be withheld by the issuer on a discretionary basis. The same result applies under Rule 16b-3(e) where the automatic feature is a tax- or exercise withholding right. 50. ****

Rule 16b-3(e) **** Because cashless exercises through a broker do not involve a transaction with the issuer or the issuer's plan, the dispositions that takes place pursuant to these transactions are not eligible for exemption pursuant to Rule 16b-3(e). 51. ****

 Rule 16b-3(e); Rule 16b-3(d)(3) **** A company grants options in reliance on the six-month holding period of Rule 16b-3(d)(3). Shortly thereafter, the company authorizes tax-withholding rights with respect to the same options pursuant to Non-Employee Director approval under Rule 16b-3(e). This bifurcated procedure should work, provided that the withholding rights are not exercised before conclusion of the six-month holding period for the related option grant.
------------------------------------

I disagree with Romeo and Dye (i.e. Alan Dye) in their following sentence since giving discretion to the insider with no discretion to the issuer is "comprehended within Section 16 (b)" and can not be made exempt by the SEC:

 Issuers might consider assuring the availability of the exemption by
 (i) eliminating the discretionary feature and making the right entirely elective on the part of the insider,
-----------------------------------------

It is clear that when the insider has discretion and the issuer has no discretion, the insider has an advantage over the issuer even when both have equal inside information.

If the issuer is required to accept the insider's choice of method of tax or exercise price payment, both parties are not on equal footing.

This situation allows the insider to reduce his/her stock position when the insider has inside information about future negative news and chooses to deliver shares to the issuer instead of cash prior to the announced earnings which this President, CEO and Chairman Director, Mr Steinour had inside information on.

The discretionary disposition of shares by the insider to the issuer where the issuer has no discretion is not exempted by 16 b-3(e). In this situation, an exemption can not be allowed by 16 b-3(e) as the disposition is "comprehended within the purpose of Section 16 b)."

**In summary:**

In my view, there is a high probability of disgorgement by the company of the profits from these matched transaction if there is a suit by me. I may be represented by attorneys and the percentage of the recovery will be perhaps 25-30% of the $367,847 to the attorneys, although I have initiated the process pro se and may initially file the suit pro se.

I am not able to determine whether you are representing Huntington Bancshares or Mr. Steinour. It seems that your refusal to disgorge profits to Huntington suggests you are representing Mr. Steinour. Please let me know whom you are representing.

If you are interested in resolving this matter, please let me know within the next 14 days, as I have attorneys interested in suing Mr. Steinmore.

Regards:


John Olagues

# Exhibit 7

**From:** John Olagues (via Google Docs) [mailto:olagues@gmail.com]
**Sent:** Monday, December 05, 2016 10:16 AM
**To:** DiPrima, Stephen R.
**Subject:** Letter to prospects

John Olagues has attached the following document:



# Letter to prospects

Dear Mr. Di Prima.

Any comments will be appreciated.

John Olagues

Google Docs: Create and edit documents online.

Google Inc. 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because someone shared a document with you from Google Docs.



John Olagues
413 Sauve Rd
River Ridge LA 70123
504-305-4071
olagues@gmail.com

Mr. Stephen R. DiPrima
Attorney for Huntington Bancshares
Wachtell, Lipton, Rosen & Katz
51 West 52 Street
New York , N.Y. 10019

December 5, 2016

Dear Mr DiPrima:

Below is an article which clearly explains the views of the American Bar Association, the New York Bar Association and the SEC as to why most discretionary dispositions made to the issuers by officers and directors are not exempt from 16 (b) as stated in the SEC clarification in [RELEASE NOS. 33-8600; 34-52202; 35-28013; IC-27025; File No. S7-27-04].

### SEC Key Consideration for Rule 16 b-3(e) exemption

What is the key consideration when determining whether a disposition from an officer or director to the issuer can be exempt from Section 16 (b) of the 1934 Securities Act?

On page 11, top paragraph of the document linked below, the SEC gives a quotation from the American Bar Association letter to the SEC on August 16, 2004 regarding what type of dispositions from an officer or director to the issuer should be exempt from section 16 (b) via Rule 16 b-3(e).
https://www.sec.gov/rules/final/33-8600.pdf

The quotations is:
"the key consideration of the statute is the absence of the ability to take advantage of the other party on the basis of inside information."

The SEC clarification of SEC Rule 16 b-3(e) linked below contains, on page 2 paragraph 3, the quote from the American Bar Association Letter of August 16, 2004 to the SEC.
https://www.sec.gov/rules/proposed/s72704/blsaba081604.pdf

1

*"Whether the transactions are compensatory in nature should be irrelevant to the purposes of Section 16, because the key consideration of the statute is the absence of the ability to take advantage of the other party on the basis of inside information. This is consistent with the Commission's view as reflected in the 1996 Release when it stated: "However, unlike the current rule, a transaction need not be pursuant to an employee benefit plan or any compensatory arrangement to be exempt, nor need it specifically have a compensatory element.""*

-------------------------------

Essentially what the ABA is saying and the SEC is accepting and making  part of the Release, is that when there is "the ability (by an officer or director) to take advantage of the other party (i.e. the issuer) on the basis of inside information", there is no exemption from Section 16 (b) for transactions involving dispositions from the officer or director to the issuer.

So the **key consideration, for a Rule 16 b(3) exemption,** is whether the officer or director has the "ability to take advantage of the other party (i.e. the issuer) on the basis of inside information", when making a discretionary decision to deliver shares or cash for the exercise price payment or the tax withholding.

It is clear that when the officer or director has discretion to deliver cash or stock for the exercise price payments or the tax withholding and the issuer has no discretion to reject the disposition of stock or cash, the officer or director has the "ability to take advantage of the other party (i.e. the issuer) on the basis of inside information". This is true since the officer or director can choose to deliver shares when he/she has inside information which is negative or can choose to deliver cash when the inside information is positive and the issuer must accept the dispositions.

Also a quote from the New York Bar Association on August 9, 2004, that was confirmed by the SEC as the SEC made it part of the Release, is below:

"Rule 16b-3(e) is entirely consistent with the intent of Congress in enacting Section 16(b), since it exempts only transactions involving parties on an equal footing from the standpoint of knowledge of inside information."

So the SEC, the American Bar Association, and the New York Bar Association all agree that SEC Rule 16 b-3(e) "exempts only transactions involving parties on an **equal footing f**rom the standpoint of knowledge of inside information". **Equal footing** requires both parties having the same inside information and the same ability to use the inside information. When only one party can use the inside information, there is no equal footing and no exemption from 16 (b) to the party which can use the inside information regardless of the approvals from a Committee.

2

**Conclusion**

In conclusion, when the officer or director has discretion and the issuer must accept the officer or director decision, there is no exemption from Section 16(b) via Rule 16 b-3(e) regardless of the approvals by the Committee or Board.  The parties are not on equal footing, when the insider can use inside information to his advantage and to the disadvantage of the issuer.

End of article

------------------------------

My view is that the SEC, the ABA and the New York Bar are stronger authorities than Romeo and Dye, who only represent defendants in 16 b cases and make suggestions on how to design plans, perhaps which your firm follows. In my view, the Donoghue case is clearly wrong.

In addition, I believe that the approvals that you have from the Committee are likely not to be adequate to get an exemption under 16 b-3(e) as the approvals do not approve specific terms of the disposition, as required.

Also, the dispositions, for about half of the total, were dispositions prior to the income calculation and tax liability occurring and I am sure that the committee did not approve dispositions for taxes that may become due in the future. Anyone who reads IRC 83 c-3 and the Strom v. U.S decision in the Ninth Circuit understands that about half of the tax liability in question here was deferred past the exercise of ESOs or vesting of RS or RSUs.

Finally, I can guarantee that either I will file a suit pro se or a qualified attorney will file a suit representing me seeking to recover profits for the issuer unless a settlement is made prior to the SOL running on any portion of the claim.

I am open for ways to resolve matters here efficiently.


John Olagues

3

# Exhibit 8

**From:** "John Olagues (via Google Docs)" <olagues@gmail.com>
**Date:** December 27, 2016 at 10:19:39 AM EST
**To:** SRDiPrima@wlrk.com
**Subject: Huntington Bancshares Suit**
**Reply-To:** John Olagues <olagues@gmail.com>

John Olagues has attached the following document:



## Huntington Bancshares Suit

Dear Mr. Diprima:

Attached is a final draft of a lawsuit that will be filed within the next 2 weeks for recovery of profits made in violation of section 16 b) of the 1934 Act by Mr.Stephen Steinour, unless a resolution is reached prior.

Please let me know if you want to resolve it before the suit is filed.

John Olagues

Google Docs: Create and edit documents online.

Google Inc. 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because someone shared a document with you from Google Docs.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT of OHIO

John A. Olagues, Pro Se
413 Sauve Rd.
River Ridge, La. 70123
olagues@gmail.com
504-305-4071

      Plaintiff             Private Right of Action
                              Under Section 16 (b) of the
                              Securities Act of 1934
                              Civil Action no.

      Versus

Stephen D. Steinour Pres. and CEO
Huntington Bancshares Inc.

      Defendants

COMPLAINT
JURY TRIAL DEMANDED

1.  Plaintiff, alleges, based upon knowledge with respect to the facts relating
    to him upon information and belief with respect to all other allegations, as follows:

INTRODUCTION

2.  This action is brought pursuant to Section 16(b) of the Securities Exchange Act of
1934, as amended (the "Exchange Act"), [15 U.S.C. 78p(b)] ("Section 16(b)") in order
to recover short-swing insider trading profits realized by defendant, Stephen D.
Steinour CEO while he was a statutory insider of Huntington Bancshares Inc.

1

3.  Stephen D. Steinour  at all relevant times was an officer of Huntington Bancshares Inc within the meaning of Section 16(b) of the 1934 Act.

4.  Section 16(b) requires company insiders to disgorge any profits earned by Section 16 (b) insiders through short-swing insider trading (i.e., purchases and sales, or sales and purchases, of the company's equity securities, within less than a six month period). Actual misuse of inside information is not a necessary element of the claim although the statute embodies a presumption that statutory insiders have access to such inside information.

<u>PARTIES</u>

- Plaintiff, John Olagues is a shareholder of Huntington Bancshares Inc

- Defendant,   Stephen D. Steinour President and CEO

- Defendant,   Huntington Bancshares Inc

5.  Huntington Bancshares Inc Common Stock is registered with the SEC pursuant to Section 12 of the Exchange Act and the Common Stock trades on the NASDAQ and NYSE under the symbol HBAN.

6.  Huntington Bancshares Inc  is a necessary party as this action is brought by Plaintiff in order to obtain a recovery for the firm, Huntington Bancshares Inc .

2

<u>JURISDICTION AND VENUE</u>

7.  Jurisdiction of this Court is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa].

8.  Venue is properly laid in this District because Defendant Stephen D. Steinour is located in this District.

<u>SUBSTANTIVE ALLEGATIONS</u>

9. The matched  transactions shown on Form 4s filed with the SEC by are listed below : The attached Document Exhibit A from SEC Form 4.com shows all of the relevant filings by Stephen D. Steinour who was an officer when the purchases and disposition were made.

**Stephen D. Steinour**

| Shares Purchased | Date | Price | Shares Disposed | Date | Price | Profit |
|---|---|---|---|---|---|---|
| 10,000 | 3/2/2016 | $9.27 | 10,000 | 11/6/2015 | $11.60 | $23,300 |
| 100,000 | 2/1/2016 | $8.57 | 100,000 | 11/6/2015 | $11.60 | $303,000 |
| 10,000 | 4/22/2015 | $10.79 | 10,000 | 6/22/2015 | $11.54 | $7500 |
| 9710 | 1/26/2015 | $10.17 | 9710 | 6/22/2015 | $11.54 | $13,302 |
| 13,496 | 10/21/2014 | $9.35 | 13,496 | 2/19/2015 | $10.64 | $17,409 |
| 2901 | 10/21/2014 | $9.35 | 2910 | 2/11/2015 | $10.50 | $3,336 |

Total profits……………………….. $367,847

 The above list is the match off of purchases and dispositions resulting in the highest claim.  Large portions of the dispositions listed on the SEC Form 4s are for payments of exercise prices of employee stock  options. Other large dispositions listed on the SEC Form 4s are for tax liabilities on the ESOs exercised or Restricted Stock units vesting. Most of the dispositions listed on the SEC Form 4s  as payment for the exercise prices and for tax liabilities are not exempt from Section 16 (b) of the 1934 act. None of the disposition of shares listed above are exempt from 16 (b).

3

10.  All of the Shares Purchased above were market transactions non exempt from section 16 b. This is conceded by attorneys for defendants. The share dispositions to Huntington Bancshares Inc were for exercise price payments and alleged tax withholdings. None of the dispositions were approved with the required specificity to achieve an exemption from Section 16 (b) via of SEC Rule 16 b-3(e). About 75% of the tax liabilities were deferred past the vesting date pursuant to IRC 83 c-3, making it such that on the day of the stock disposition, there could be no exemption via Rule 16 b-3(e) for such premature tax withholding dispositions. All of the dispositions were "comprehended within the purpose of 16 (b)" and can not be made exempt from section 16(b) by approval of 16 b-3(e).

11.  Deferral of the income calculation and tax liability past vesting for Mr. Stephen D. Steinour is confirmed by IRC 83 c-3 and interpretations of it as below.

**IRC 83-c(3)**

***Sales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934***

*So long as the <span style="color:red">sale</span> of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are—*

*(A)       subject to a substantial risk of forfeiture, and*

*(B)       not transferable.*

IRC 83 c-3 makes a receipt of shares from the exercise of ESOs and the vesting of RSUs subject to forfeiture and non transferable and therefore the the tax liability is deferred to when a <span style="color:red">sale</span> was not subject to a risk of forfeiture and was transferable.

4

12**. Below is the paragraph from an IRS Bulletin of March 17, 2014 relating to IRC 83 c-(3)**

*Specifically, practitioners asked whether the* **purchase of shares** *in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934* **prior to the exercise of a stock option** *that would not otherwise give rise to section 16(b) liability would defer taxation of the stock option exercise. Treasury and the IRS do not believe that such a non-exempt purchase of shares would defer taxation of the subsequent stock option exercise. This result is consistent with Example 3 of § 1.83–3(j)(2). In response to these requests for clarification, Treasury and the IRS have revised Example 4 of proposed regulation § 1.83–3(j)(2) to address the situation raised.*

13.  Few practitioners understand IRC 83 c-(3) and are confused by the IRS examples.They do not understand the IRS clarification and believe that IRC 83(c) does not apply in any cases.

14.  Judge Berzon of the Ninth Circuit Court of Appeals in Strom v. U.S. 107 AFTR 2d 2011-684  (9th Cir., 2011)  illustrates in the verbatim quote below  that income calculation and tax liability is deferred when there is a non exempt purchase within 6 months prior to an exercise of ESOs or vesting of RSUs

 BERZON, Circuit Judge:

*Ordinarily, when an employee is compensated with nonstatutory stock options that do not have a readily ascertainable fair market value at the time of the grant, the employee realizes income for tax purposes upon exercising the options.1 See 26 U.S.C. §§ 83(a) & (e)(3)-(e)(4); 26 C.F.R. § 1.83-7(a). The taxpayer is taxed on an amount equal to the fair market value of the stock on the date of exercise minus the option price paid for the stock. See 26 C.F.R. §1.83-1(a)(1); id. §1.83- 7(a)*

 *Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and  valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3).*

5

*Section 16(b), in turn, forbids a corporate insider from profiting on a purchase made within six months of a sale (or a sale made within six months of a purchase) of the corporation's stock. See 15 U.S.C. § 78p(b). If a taxpayer is permitted to defer tax consequences under IRC § 83(c)(3), the taxpayer will be later taxed on an amount equal to the fair market value of the stock on the date that § 83(c)(3) no longer applies minus the option price paid for the stock. See 26 U.S.C. § 83(a); 26 C.F.R. § 1.83-1(a)(1).*

15.  The Ninth Circuit Ruling is the highest authority on how IRC 83 c-(3) works. Some attorneys claim that certain IRS examples of the IRS refute the Ninth Circuit , the March 17, 2014 Bulletin and the clear language IRC 83 c-3.


## BASIS FOR INFORMATION AND BELIEF

16.  Plaintiff's information and belief is based on, among other things, the SEC Form 4s referenced herein and the violations of the Securities law as described above. Also the SEC Staff opinion expressed in the Q and A,  No.123.16 of May 23, 2007 support Plaintiff's view that dispositions must be automatic with no discretion to the issuer.

## ALLEGATIONS AS TO DEMAND

17.   Plaintiff notified Huntington Bancshares Inc  of the facts alleged above (the "Demand"). Attorneys for Huntington Bancshares Inc refused to request disgorgement of the profits from Stephen D. Steinour and refused to file suit to recover such profits totaling $367,847, after 60 days have passed from the 60 day notices were received by Huntington Bancshares Inc.

18. The attorneys for  Huntington Bancshares Inc in a letter to Plaintiff, alleged that the dispositions from Stephen D. Steinour to Huntington Bancshares Inc  were exempt from Section 16 b of the 1934 Act via SEC Rule 16 b-3(e) and thus the attorneys alleged that the dispositions on 2/11/2015, 2/19/2015, 6/22/2015, 11/6/2015, 4/20/2016, and 5/1/2016 11/6/2015  could not be matched for section 16 b purposes with any of the purchases between 10/21/2014 and 3/2/2016.

6

19.  Plaintiff claims that there was no proper approval of the dispositions from to Huntington Bancshares Inc and there was no exemptions from Section 16 b of the 1934 Securities Act for the dispositions here.

## PRAYER FOR RELIEF

20.  WHEREFORE, Plaintiff prays for judgment against Defendant in an amount to be determined at trial, plus prejudgment interest, post-judgment interest and such other and further relief as this Court may deem just and proper.

21.  The amount to be at a minimum of $ 367,847 which is the total profit received from non exempt purchases and non exempt dispositions.

Respectfully Submitted

DATED this   th day of December, 2016.

John Olagues

7

# EXHIBIT A

http://www.secform4.com/insider-trading/1213991.htm

# Exhibit 9

**From:** "John Olagues (via Google Docs)" <olagues@gmail.com>
**To:** "DiPrima, Stephen R." <SRDiPrima@WLRK.com>
**Subject: Analysis of Section 16(b) 3(e) of the Securities Exchange Act of 1934**

John Olagues has attached the following document:



## Analysis of Section 16(b) 3(e) of the Securities Exchange Act of 1934

Dear Stephen:

Attached is a comprehensive analysis of what is required to achieve an exemption from section 16 (b) via Rule 16 b-3(e).

Of course some of the ideas in this article were mentioned in other communications to you. Please review and make any comments you wish that may lead to an efficient resolution.

Regards:

John Olagues

Google Docs: Create and edit documents online.

Google Inc. 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because someone shared a document with you from Google Docs.



**Analysis of Exemptions from Section 16 (b) the Securities Exchange Act of 1934**
As applied to dispositions from officers and directors to the issuers.

**Below is Section 16 (b) of the 1934 Act**

*"(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months.*

*Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized.*

*This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement or a security-based swap involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."*
-----------------------------------

Its purpose is to prevent **"the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer,"**

However: **"This subsection shall not be construed to cover ……..any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."**

So the Commission (i.e. the SEC) can exempt only transactions that are **not** comprehended within the purpose of the subsection and practitioners can not interpret SEC Rules in a manner where exemptions are available for transactions comprehended within the purpose of the subsection.

1

Below is what the Third Circuit Court of Appeals stated about the SEC's ability to exempt transactions from section 16 (b).

First Paragraph of :

### United States Court of Appeals,Third Circuit.

### Mark LEVY, Appellant v. STERLING HOLDING COMPANY, LLC; National Semiconductor Corporation; Fairchild Semiconductor International, Inc.No. 07-1849. Decided: October 1, 2008

*According to the statute itself, the purpose of section 16(b) is "preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b). The statute authorizes the SEC to promulgate rules and regulations exempting from liability transactions that are "not comprehended within[this] purpose." Id.; see Levy I, 314 F.3d at 112. Exercising this authority, the SEC has established a number of section 16(b) exemptions. See 17 C.F.R. §§ 240.16b-1, .16b-3, .16b-5 to .16b-8 (codifying SEC Rules 16b-1, 16b-3, and 16b-5 to 16b-8).*
-----------------------------------------------------------------------

SEC Rule 16 b-3(e) can exempt certain dispositions by officers or directors to the issuer when the dispositions of equity securities are made from the officers or directors to the issuer that are properly approved by the issuer Board or Compensation Committee, and which are "***not comprehended within the purpose of this subsection.***"

Below is SEC Rule 16 b-3(e).

**(e) *Dispositions to the issuer.*** Any transaction, other than a Discretionary Transaction, involving the disposition to the issuer of issuer equity securities, whether or not intended for a compensatory or other particular purpose, shall be exempt, provided that the terms of such disposition are approved in advance in the manner prescribed by either paragraph (d)(1) or paragraph (d)(2) of this section.

Below is Note (3)

**Note (3):**
The approval conditions of paragraphs (d)(1), (d)(2) and (e) of this section require the approval of each specific transaction, and are not satisfied by approval of a plan in its entirety except for the approval of a plan pursuant to which the terms and conditions of each transaction are fixed in advance, such as a formula plan. Where the terms of a subsequent transaction (such as the exercise price of an option, or the provision of an exercise or tax withholding right) are provided for in a transaction as initially approved pursuant to paragraphs (d)(1), (d)(2) or (e), such subsequent transaction shall not require further specific approval.

Below is SEC Rule 16 b-3(d)(1) and (2)

**(d) *Acquisitions from the issuer.*** Any transaction, other than a Discretionary Transaction, involving an acquisition from the issuer (including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose, shall be exempt if:

**(1)** The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors;

**(2)** The transaction is approved or ratified, in compliance with section 14 of the Act, by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; ***provided that*** such ratification occurs no later than the date of the next annual meeting of shareholders; or

-------------------------------------------------------------------

So the SEC created Rule 16 b-3(e) to give exemptions for dispositions from officers or directors to the issuer as long as there is proper approvals as required by Rule 16 b-3(e), Rule 16 b-3(d) (1) and (2) and Note 3.

 Of course Rule 16 b-3(e) can not be interpreted to exempt transactions that are **"*comprehended within the purpose of this subsection.".***

The American Bar Association in a letter to the SEC on August 16, 2004 page 2 paragraph 3 linked below,

*https://www.sec.gov/rules/proposed/s72704/blsaba081604.pdf*

regarding what type of dispositions from an officer or director to the issuer should be exempt from section 16 (b) via Rule 16 b-3(e) said:

 "*Whether the transactions are compensatory in nature should be irrelevant to the purposes of Section 16, **because the key consideration of the statute is the absence of the ability to take advantage of the other party on the basis of inside information.**"*

The SEC accepted and adopted the idea that "***the key consideration of the statute is the absence of the ability to take advantage of the other party on the basis of inside information***" *by quoting from the ABA letter the paragraph in the SEC release [RELEASE NOS. 33-8600; 34-52202; 35-28013; IC-27025; File No. S7-27-04] page 11 paragraph 1.*

3

Below is the link to the SEC Release effective August 9, 2005

 *https://www.sec.gov/rules/final/33-8600.pdf*

In the same Release effective August 9, 2005, the SEC also accepted and adopted the paragraph from a letter of the New York State Bar Association to the SEC on August 9, 2004, which is below on page 3 paragraph 2. The New York State Bar Association letter is linked below:

 https://www.sec.gov/rules/proposed/s72704/nysba080904.pdf

"Rule 16b-3 is entirely consistent with the intent of Congress in enacting Section 16(b), since **it exempts only transactions involving parties on an equal footing from the standpoint of knowledge of inside information"**
-------------------------------------------------

So the starting point, in determining whether a disposition of equity securities from the officer or director to the issuer can be exempt from section 16 (b) of the 1934 Act, is to determine whether the officer or director has **equal standing** with the issuer regarding insider information and its use in making such transactions.

A clear example of an officer making a disposition to the issuer that is **"comprehended within the purpose of section 16 (b)"** ( and can not be exempted) is when the officer has discretion to deliver shares or cash for the payment of a tax liability from vesting of restricted stock units and the issuer must accept the officer's decision. Clearly the officer has superior footing since the officer can use inside information but the issuer can not use the inside information.

Another clear example of an officer making a disposition to the issuer that is **"comprehended within the purpose of section 16 (b)."** is when the officer has discretion as to the timing of the exercise of Employee Stock Options and the delivery of shares for payment of the exercise price instead of cash. Again, the officer has superior footing over the issuer with regard to the use of inside information relating to the timing of the exercise of the ESOs and the delivery of shares to pay the exercise price.

In both examples above, the officer could choose to pay with stock when the officer had negative inside information about future company announcements, but could pay with cash when the officer had positive inside information about future announcements. In both cases the issuer was required to accept the dispositions. In both cases, the dispositions to the issuer were transactions with the issuer where the officer had superior footing.

4

Once it is determined that the transaction is **"not *comprehended within the purpose of the subsection 16 (b)."*,** it is possible to get an exemption if the transaction is approved consistent with the requirements of SEC Rule 16 b-3(e).

 Below is a relevant sentence from Note (3)

*"The approval conditions of paragraphs (d)(1), (d)(2) and (e) of this section require the approval of each specific transaction, and are not satisfied by approval of a plan in its entirety except for the approval of a plan pursuant to which the terms and conditions of each transaction are fixed in advance, such as a formula plan."*

The above paragraph says that it is possible to meet the approval requirements of
 Rule 16 b-3(e) by having approval of a Plan, where the terms and conditions of each transaction are fixed in advance.

What are the requirements to have terms and conditions of a disposition of shares of stock to the issuer by an officer or director fixed in advance? When the officer has discretion as to the timing or the amount of shares to be disposed or the issuer has discretion as to the timing or the amount of shares to be accepted, the terms and conditions are not fixed in advance to qualify the transaction as exempt to satisfy approval via Plan approval.

So if an exemption is not achieved via Plan approval, there must be "*approval of each specific transaction" in advance of the transaction.* And that approval must be made by the Compensation Committee or the Board of Directors in advance of each specific transaction.

Note (3) also says:

"*Where the terms of a subsequent transaction (such as the exercise price of an option, or the provision of an exercise or tax withholding right) are provided for in a transaction as initially approved pursuant to paragraphs (d)(1), (d)(2) or (e), such subsequent transaction shall not require further specific approval."*

What exactly does the paragraph above mean? My understanding is that often, the Grant Agreement addresses what the terms of a possible disposition to the issuer of shares for payment of the exercise price or to pay a tax liability. Most Grant Agreements do not specifically require delivery of shares for the full payment of exercise price payments or tax liabilities. Many Grant Agreements give discretion to the issuer, some give discretion to the officer or director to choose the form of satisfaction of the withholdings. Some allow the issuer to permit the officer or director the right to elect to deliver shares. Some require the officer or director to make share dispositions to the issuer .

5

The SEC staff envisioned that it was possible for the disposition of shares to be automatic for exercise price payments or tax payments with the issuer having discretion to reject the disposition of such shares. These circumstances thereby, according to the SEC staff, made the automatic dispositions for the tax or exercise price not exempt from 16 (b) via SEC Rule 16 b-3(e).

The staff illustrated its view in the Q and A # 123.16 of May 23, 2007 which is below.

**Question: Would approval of a grant that by its terms provides for automatic reloads satisfy the specificity of approval requirements under Rule 16b-3(d) for the reload grants?**

**Answer: Yes. Approval of a grant that by its terms provides for automatic reloads would satisfy the specificity of approval requirements under Rule 16b-3(d) for the reload grants, unless the automatic reload feature permitted the reload grants to be withheld by the issuer on a discretionary basis.**

**The same result applies under Rule 16b-3(e) where the automatic feature is a tax- or exercise-withholding right. [May 23, 2007]**
-------------------------------------------------------------------

Another consideration in determining whether a disposition of shares to the issuer by an officer or director for a tax liability upon vesting of RSUs or the exercise of ESOs is exempt from 16 b, is whether IRC 83 c-3 deferred the income calculation and the tax liability past the vesting date or exercise date.

Below is IRC 83(c)(3).

*Sales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934*

*So long as the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are—*

*(A)    subject to a substantial risk of forfeiture, and*

*(B)    not transferable.*

----------------------------------------------------

6

For example if an officer bought 100,000 shares at $20.00 and three months later his RSUs vested, when the stock was trading at $25.00 and the officer was still an officer, a non exempt sale of stock would cause a violation of 16 b. Therefore the shares received from vesting were still considered forfeitable and non transferable. Under these conditions, the income calculation and liability is deferred until a non exempt sale would not cause a 16(b) violation.

**Few practitioners understand IRC 83 c-(3) and are confused by the IRS examples.They do not understand the IRS clarification of March 17, 2014 and believe that IRC 83(c) does not apply in any cases.**

Judge Berzon of the Ninth Circuit Court of Appeals in Strom v. U.S. illustrates in the verbatim quote below, that income calculation and tax liability are deferred when there is a non exempt purchase within 6 months prior to an exercise of ESOs when the stock is trading higher on the day of exercise than it was trading when the purchase was made.

 BERZON, Circuit Judge:

*Ordinarily, when an employee is compensated with nonstatutory stock options that do not have a readily ascertainable fair market value at the time of the grant, the employee realizes income for tax purposes upon exercising the options.1 See 26 U.S.C. §§ 83(a) & (e)(3)-(e)(4); 26 C.F.R. § 1.83-7(a). The taxpayer is taxed on an amount equal to the fair market value of the stock on the date of exercise minus the option price paid for the stock. See 26 C.F.R. §1.83-1(a)(1); id. §1.83- 7(a)*

 *Internal Revenue Code § 83(c)(3), however, allows taxpayers to defer recognition and valuation of income so long as a profitable sale of the stock acquired through the exercise of the options "could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934." 26 U.S.C. § 83(c)(3).*

*Section 16(b), in turn, forbids a corporate insider from profiting on a purchase made within six months of a sale (or a sale made within six months of a purchase) of the corporation's stock. See 15 U.S.C. § 78p(b). If a taxpayer is permitted to defer tax consequences under IRC § 83(c)(3), the taxpayer will be later taxed on an amount equal to the fair market value of the stock on the date that § 83(c)(3) no longer applies minus the option price paid for the stock. See 26 U.S.C. § 83(a); 26 C.F.R. § 1.83-1(a)(1).*

**Below is the paragraph from an IRS Bulletin of March 17, 2014**

*Specifically, practitioners asked whether the **purchase of shares** in a transaction not exempt from section 16(b) of the Securities Exchange Act of 1934 **prior to the exercise of a stock option** that would not otherwise give rise to section 16(b) liability would defer taxation of the stock option exercise. Treasury and the IRS do not believe that such a non-exempt purchase of shares would defer taxation of the subsequent stock option exercise. This result is consistent with Example 3 of § 1.83–3(j)(2). In response to these requests for clarification, Treasury and the IRS have revised Example 4 of proposed regulation § 1.83–3(j)(2) to address the situation raised.*

This paragraph from the IRS Bulletin of March 17, 2014, clearly illustrates that the IRS believes that IRC 83 c-3 would defer taxation of the stock option exercised by an officer, when a non exempt purchase of stock was made less than 6 months prior to the stock option exercise, with the stock, when purchased, was trading substantially below the stock price on the day the ESOs were exercised.

### Summary

To achieve an exemption from 16 b for disposition to the issuer, the following 3 requirements are necessary.

1) The transaction must **not be comprehended within the purpose of Section 16 b**.
2) The required prior approvals of the terms and conditions of the disposition are met with sufficient specificity by the Board or the Compensation Committee either in the Plan Document of the Grant agreement or by approval of each specific transaction..
3) IRC 83 c-3 may defer the tax liability, making it such that all or parts of the dispositions for tax withholdings are not exempt from 16 (b) at the time of the disposition, since no approvals are ever for a tax withholding that comes premature to the income calculation of the taxes.

8

John Olagues

# Exhibit 10

Mr. James Dimon Chairman CEO
&
Mr Anthony Horan
J.P. Morgan
270 Park Ave
New York 10017 .                                   A demand for return of 16b) profits

Dear Sirs:                                          February 13, 2014

After an analysis of the trading history by Mr. Dimon of the equity shares of J.P.Morgan,
it is apparent to me that Mr.Dimon have violated Section 16 (b) of the Securities Act of
1934, as is explained below

The specific transactions are below.

A) Mr. Dimon bought 250,000 shares of J P Morgan on July 19 and 20 of 2012 for a
price of $34.01

see link: http://www.secform4.com/filings/19617/000122520812016509.htm

and

B) He Sold 121,648 shares  on Jan 13, 2013 at $45.81.(i.e. he held the shares less than
6 months).

See link: http://www.secform4.com/filings/19617/000122520813001596.htm

The sale of the 121,648 shares is not exempt from 16(b) since the sale was a
Discretionary Transaction and the sale was in effect a sale to the market.

Please return the profits to the J.P. Morgan shareholders after deducting 10% of the
profits and send the 10% to me at the address below:

If the profits made are not returned to the shareholders with the 10% to the writer, or a
sufficient reason is not given that prove Mr. Dimon's purchase and sale are not subject
to 16(b), a private right of action will be filed under 16(b) to force the shareholder
recovery after 60 days from your receipt of this letter.

John Olagues
413 Sauve Rd
River Ridge, Louisiana 70123
USA
olagues@gmail.com

# Exhibit 11

**Finn, Andrew J.**

| | |
|---|---|
| **From:** | John Olagues <olagues@gmail.com> |
| **Sent:** | Friday, July 11, 2014 9:07 AM |
| **To:** | Finn, Andrew J. |
| **Subject:** | 16 b case versus James Dimon |

Dera Andrew:

Thank you for the time yesterday where I believe some understandings were made to move the case along.

I believe that Mr. Dimon's maximum liability to JPMC is about $3.8 million.

That number is derived from first taking a match-off of the 121,000 share "sale" disposition on Jan 13, 2013 first against 121,000 of the shares bought on July 19,20, 2012 which produced a profit of about about $1.4 million.

The 379,000 shares of the 500,000 would then be matched off against the 379,000 share "sale" disposition of March 2, 2012, which produced a profit of approximately $2.4 million.

If the suit was successful in all respects after reasonable court proceeding, the court should order approximately 20-25% of the $3.8 million in attorney fees which may be in the neighborhood of $800,000- $900,000, plus Mr. Dimon would have to pay the profit to JPMC.

My offer to settle now is the following:

A. $150,000 now... payable when the statute of limitations expire for the "sale" of March 2. 2012, which is July 20, 2014 and

B. $75,000 when the statute of limitations expire on the 121,000 "sale" disposition, which will be Jan 13, 2015.

John Olagues
504-875-4825

# Exhibit 12

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

JOHN OLAGUES,

                         Plaintiff,                No. 14-CV-4872 (GHW)

- against -

JAMES DIMON and
JPMORGAN CHASE & CO.,

                         Defendants.

-----------------------------------------------------------------------x

## STIPULATION OF VOLUNTARY DISMISSAL WITH PREJUDICE

Pursuant to Rule 41(a)(1)(A)(ii), the Plaintiff, Defendant James Dimon and nominal

Defendant JPMorgan Chase & Co. hereby stipulate to the dismissal of the entire action with

prejudice. Each side shall bear their own costs and fees, including all attorney fees.

Dated: July 10, 2015

| | |
|---|---|
| John Olagues, | James Dimon and JPMorgan Chase & Co., |
| By his attorneys, | By their attorneys, |
| *[signature]* | *[signature]* |
| Jack G. Fruchter | Sharon L. Nelles |
| Abraham, Fruchter & Twersky, LLP | Andrew J. Finn |
| One Penn Plaza, Suite 2805 | Sullivan & Cromwell LLP |
| New York, New York 10119 | 125 Broad Street |
| Tel: 212.279.5050 | New York, New York 10004 |
| Fax: 212.279.3655 | Tel: 212.558.4000 |
| | Fax: 212.558.3588 |

# Exhibit 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

JOHN OLAGUES,                                          :
                                                       :
                                     Plaintiff,        :
                                                       :                  1:15-cv-0898-GHW
                        -v-                             :                  1:15-cv-2476-GHW
                                                       :                  1:15-cv-2478-GHW
CARL C. ICAHN, HIGH RIVER LIMITED                      :
PARTNERSHIP, ICAHN PARTNERS LP,                        :                  MEMORANDUM OPINION
ICAHN PARTNERS MASTER FUND LP,                         :                  AND ORDER
ICAHN PARTNERS MASTER FUND II LP, and                  :
ICAHN PARTNERS MASTER FUND III LP,                     :
                                                       :
                                                       :
                                     Defendants.       :
----------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

 Plaintiff, Mr. John Olagues, contends that Defendants understated the short-swing profit

that they received upon the cancellation of certain put options. The relevant rule issued by the

Securities and Exchange Commission—Rule 16b-6(d)—states that the profit obtained upon

cancellation of such options may not exceed the amount of the premium received by the writer of

the put. Plaintiff asserts that Defendants' profits exceeded the $0.01 per share premium actually

paid to them for writing the puts. Instead, by deconstructing Defendants' transactions and pricing

the resulting component parts, Plaintiff postulates that Defendants also received the benefit of an

implicit discount embedded within the transactions. He seeks to recapture the "value" of that

discount as a short-swing profit. Because Section 16(b) liability cannot be established, or enhanced,

by a creative plaintiff's "strained attempt to carve up a single . . . transaction by calling it something

which it is not," *Freedman v. Barrow*, 427 F. Supp. 1129, 1152 (S.D.N.Y. 1976), the Court grants

Defendants' motions to dismiss.

## I.      Background

### A.  Factual Background[1]

Plaintiff, Mr. John Olagues, is a shareholder of three companies:  Herbalife, Ltd. ("Herbalife"), Hologic, Inc. ("Hologic"), and Nuance Communications, Inc. ("Nuance").  Herbalife Compl. ¶ 3, Hologic Compl. ¶ 3, Nuance Compl. ¶ 3.  The common stock of each of those three companies is registered with the United States Securities and Exchange Commission (the "SEC") pursuant to Section 12 of the Securities Exchange Act and is traded on NASDAQ.  Herbalife Compl. ¶ 10, Hologic Compl. ¶ 10, Nuance Compl. ¶ 10.  Mr. Carl C. Icahn ultimately manages the investments of each of the limited partnerships named as defendants in these related cases (together with Mr. Icahn, "Defendants").  Herbalife Compl. ¶¶ 5-9, Hologic Compl. ¶¶ 5-9, Nuance Compl. ¶¶ 5-9.  The Defendants were, at all relevant times, statutory insiders holding more than 10% of the stock of each of Herbalife, Hologic, and Nuance.  Herbalife Compl. ¶ 17, Hologic Compl. ¶ 15, Nuance Compl. ¶ 16.

Plaintiff filed three separate actions alleging that Defendants violated section 16(b) of the Exchange Act of 1934 ("Section 16(b)"), 15 U.S.C. § 78p(b), by failing to disgorge short-swing profits that they obtained from derivative transactions involving Herbalife, Hologic, and Nuance. The facts in each case differ—each case involves the stock of a separate issuer, and different trades and trade prices.  But all three cases rest on a common theory regarding how Defendants' profits from the derivative transactions at issue should be calculated.  Because the Court concludes that

---

[1] Unless otherwise noted, the facts are taken from Plaintiff's complaints in actions 15-cv-898, Dkt. No. 21 ("Herbalife Compl."), 15-cv-2467, Dkt. No. 1 ("Hologic Compl."), and 15-cv-2478, Dkt. No. 1 ("Nuance Compl."), which, with the exception of the specific transactions at issue, advance similar if not identical allegations.  Although the securities issuers have since been dismissed, *see infra* Part I.B, the Court will refer to the complaints using the corresponding issuer for ease of reference.  The Court will accept the facts as alleged in the complaints as true for the purposes of these Rule 12(b)(6) motions. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

theory is unsound, the Court focuses below on the details of only one of the three actions—Herbalife. Plaintiff's allegations regarding Defendants' transactions in Herbalife parallel those in his other two cases, but because the Herbalife case involves the fewest individual trades, it is the simplest vehicle for illustrating the flaws in Plaintiff's theory.

Before turning to the specifics of the Herbalife transaction, a very short primer on the type of derivative transactions at issue in these cases is in order.[2] The cases all involve put options and call options of each issuer's stock. A put involves two parties—the put seller and the put buyer. By entering into a put, the put buyer obtains the right to force the put seller to buy shares within an agreed-upon time frame at an agreed price—the exercise price. Herbalife Compl. ¶ 18. In exchange for committing to buy the shares, the "put seller receives a fee—the premium." *Id.* ¶ 20. Plaintiff concisely explains the economic incentives associated with a put as follows:

> If the stock's price falls below the strike price, the put buyer is likely to exercise the put option and the put seller will likely have to purchase shares from the put buyer when the options is exercised. Therefore, *a put seller usually has a neutral or positive outlook on the stock* that he can use to create a profitable position. If the stock price ultimately moves in line with this outlook, the put is unlikely to be exercised and the put writer keeps the premium as a profit for writing the put.

*Id.* (emphasis added).

Conversely, a call option gives the buyer of the option the right to buy shares of an underlying stock at a specified, predetermined price—the exercise price—during a specified time period. The call option seller is obligated to sell those shares to the call option buyer if the buyer exercises the right to do so before the expiration date. *See* Introduction to Options. In other words, a call option allows the buyer to "call in" the shares. To retain the right to do so, the call option

---

[2] This description of the puts and calls at issue in this case is derived from the Herbalife complaint. If the reader wants to learn more, additional information is available from the SEC Investor Bulletin: An Introduction to Options, https://www.sec.gov/oiea/investor-alerts-bulletins/ib_introductionoptions.html (Mar. 18, 2015) ("Introduction to Options").

buyer pays a premium to the call option seller. *Id.* A call option buyer is more likely to exercise the right to call in the shares if the stock price goes above the exercise price. At that point, the buyer can purchase shares at the lower price and make a profit by selling the shares at the higher market price. *Id.*

As alleged in the Herbalife Complaint, the Defendants entered into agreements, pursuant to which they acquired both puts and corresponding calls for Herbalife stock. Herbalife Compl. ¶ 22. Each of the put options had an exercise price of $23.50, and an expiration date of May 10, 2013. *Id.* ¶ 18. The premium paid to the Defendants for writing the puts was $0.01 per share. *Id.* The Herbalife Complaint lays out the specific put transactions as follows:

| Date | Number of Shares | Exercise Price | Expiration Date | Price |
|------|------------------|----------------|-----------------|-------|
| February 12, 2013 | 1,167,241 | $23.50 | May 10, 2013 | $0.01 |
| February 13, 2013 | 508,311 | $23.50 | May 10, 2013 | $0.01 |
| February 14, 2013 | 1,555,054 | $23.50 | May 10, 2013 | $0.01 |

In the same agreement in which the Defendants acquired the puts, they also acquired corresponding call options over Herbalife stock. *Id.* ¶ 22.[3] The exercise price for each of the call options was also $23.50; like the put options, the call options expired on May 10, 2013. The price of each of the call options varied for each of the dates on which the call options were written, as illustrated in the following chart from the Herbalife Complaint:

---

[3] Each of the complaints alleges that the instruments pursuant to which Defendants acquired the relevant puts and calls were generically termed "Put and Call Option agreements." *See, e.g.,* Herbalife Compl. ¶ 22. Consistent with that allegation, there is no dispute that the puts and corresponding calls were acquired pursuant to integrated agreements containing both the put and the corresponding call. *See, e.g.,* Memorandum of Law in Opposition to Defendants' Motion to Dismiss, Dkt. No. 37 ("Herbalife Opposition") at 13. Defendants request that the Court take judicial notice of the fact that the agreements at issue were a particular variety of agreement, known as a "Delta One" financial instrument, as described in a Wikipedia entry. Defs.' Mem. of Law in Supp. of the Mots. to Dismiss ("Defs.' Br.") at 3-4. The Court declines to take judicial notice of the asserted fact that the instruments at issue were Delta One instruments. Instead, the Court accepts as true the complaints' allegation that the puts and calls were acquired pursuant to generic "Put and Call Option agreements" containing the terms described in each of the complaints.

| Date | Number of Shares | Exercise Price | Expiration Date | Price |
|------|------------------|----------------|-----------------|-------|
| February 12, 2013 | 1,167,241 | $23.50 | May 10, 2013 | $12.51 |
| February 13, 2013 | 508,311 | $23.50 | May 10, 2013 | $12.78 |
| February 14, 2013 | 1,555,054 | $23.50 | May 10, 2013 | $14.05 |

The put and call options acquired by Defendants were structured so that the put options would expire immediately if the corresponding call options were exercised. Herbalife Compl. ¶ 22. As Plaintiff describes in his opposition, "[t]he Icahn transactions were structured such that the Corresponding Call Options purchased by Defendants and the Put Options written by them contained mutually offsetting terms, such that Defendants' exercise of the Call Option caused the expiration of the Put Options." Herbalife Opposition at 9. Because Defendants could choose when to exercise the call options, they could choose the date on which the put options would terminate—in that event, the put options would terminate on the date of exercise of the call, not May 10. And indeed, on February 28, 2013, approximately two weeks after they entered into each of the put and call agreements, Defendants exercised the call options "and therefore, pursuant to the Put and Call Option agreements, all of the Put Options expired, i.e., they were cancelled." Herbalife Compl. ¶ 23.

The cancellation of the put options generated short-swing profits for Defendants. Rule 16b-6(d) issued by the SEC explains how short-swing profits should be calculated when an option, such as the put options here, is cancelled: "Upon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act. *The profit shall not exceed the premium received for writing the option.*" 17 C.F.R. § 240.16b–6(d) ("Rule 16b-6(d)") (emphasis added). Defendants reported that they received $0.01 per share in premium for the put options. Herbalife Compl. ¶ 25. Although not pleaded in the complaints, Plaintiff and Defendants agree that Defendants have reimbursed

Herbalife that amount, and that Defendants reimbursed Hologic and Nuance the equivalent amounts.[4]

Plaintiff's theory in all three cases is that the correct measure of Defendants' profits is not the $0.01 per share "premium received" by Defendants for writing the cancelled puts, as specified in the relevant agreements, and as reported by Defendants. Plaintiff asserts instead that "the premium the Icahn Entities reported receiving from the writing of the Put Options did not reflect the true economic value of those transactions and the Icahn Entities in fact received additional consideration for writing the Put Options which they failed to report." Herbalife Compl. ¶ 32. Plaintiff arrives at that conclusion by deconstructing the integrated put and call agreements into their separate component parts. Then he prices those separate elements, using information available for similar, open-market trades. He then compares those prices with those embedded in Defendants' transactions. Having done so, Plaintiff assesses that the premium Defendants charged for the puts was too low, and that the exercise price for the call options was also too low. He concludes "the amounts the Icahn Entities reported receiving from the writing of the Put Options did not reflect the true premium *consideration obtained*, as the amounts reported did not include the discounts, offsets or deductions obtained on the premiums paid for the Call Options." Herbalife Comp. ¶ 30 (emphasis added). The reader will note that Plaintiff's theory seeks to recover the "premium consideration obtained," rather than "premium received," as provided in Rule 16b-6(d). And the Court will discuss that distinction. But, first, we turn to the facts pleaded to support Plaintiff's theory.

---

[4] Plaintiff's counsel advised the Court that "[i]ndeed, [Defendants] have conceded in some fashion that there is Section 16(b) liability because they have paid back the one penny to the issuers." May 17, 2015 Hr'g Tr. at 3. Dkt. No. 29 in 1:15-cv-898-GHW.

The put and call options acquired by Defendants were bespoke transactions, negotiated between them and unidentified counterparties. Such transactions are referred to as "over-the-counter" transactions, and take place on what the Plaintiff describes as the "over-the-counter market." *Id.* ¶ 26. As Plaintiff describes, "over-the-counter options traders can choose the characteristics of the options traded." *Id.* Because Defendants executed their trades over-the-counter, "they were able to arrange a specific strike price and a specific expiration date." *Id.*

To evaluate the pricing of Defendants' transactions, Plaintiff pulled a sample of the prices for put and call options available on the open market as reported by the Chicago Board Options Exchange (the "CBOE"). *Id.* Plaintiff describes the CBOE as "a regulated options exchange where the terms of each option are standardized by the exchange, i.e., the underlying asset, quantity, expiration date and strike price are known in advance." *Id.* Plaintiff was not able to obtain identical comparisons for Defendants' put options, but he details "similar" put options that he found reported by the CBOE:

- February 12, 2013—a put written that day for Herbalife Common Stock with a strike price of $22.5 and an expiration date of May 18, 2013 had a bid of $0.90 and an ask of $1.1 per share;
- February 12, 2013—a put written that day for Herbalife Common Stock with a strike price of $24 and an expiration date of May 18, 2013 had a bid of $1.1 and an ask of $1.3 per share;
- February 13, 2013—a put written that day for Herbalife Common Stock with a strike price of $22.5 and an expiration date of May 18, 2013 had a bid of $0.80 and an ask of $1 per share;
- February 13, 2013—a put written that day with Herbalife Common Stock with a strike price of $24 and an expiration date of May 18, 2013 had a bid of $1 and an ask of $1.2 per share;
- February 14, 2013—a put written that day with Herbalife Common Stock with a strike price of $22.50 and an expiration date of May 18, 2013 had a bid of $0.70 and an ask of $0.85 per share; and
- February 14, 2013—a put written that day for Herbalife Common Stock with a strike price of $24 and an expiration date of May 18, 2013 had a bid of $0.90 and an ask of $1.1 per share.

*Id.*

Plaintiff acknowledges that these quotes are "similar, albeit not identical" to the terms of the puts acquired by Defendant. *Id.* ¶ 27. Apart from the pricing term, which is the focus of Plaintiff's analysis, the quoted puts have different expiration dates and strike prices than those acquired by Defendants. Significantly, all of these prices were reported for open market quotes for stand-alone put rights only—they relate to only one leg of the put and call agreements entered into by Defendants. Plaintiff does not plead that the stand-alone put rights for which he obtained pricing have other features similar to those contained in Defendants' derivatives. Principally, Plaintiff does not plead that these put option prices obtained on the CBOE were sold with corresponding call options, or that they can be cancelled by their holder prior to their stated expiration date through the exercise of corresponding call options, as was the case with Defendants' options. Plaintiff also does not identify the volume of options available on the market within the reported bid-ask spreads, so he does not plead that the 3,230,606 put options acquired by the Defendants would (or could) have been obtained on the open market at the prices quoted.

Plaintiff also identified the open market pricing for call options quoted on the CBOE. He reports that "on February 12, 2013, a call purchased that day for Common Stock with a strike price of $24.00, a similar strike price to the Icahn Entities' options, and an expiration date of May 18, 2013 had an ask price of $13.00 per share." *Id.* ¶ 28. Plaintiff again acknowledges that his proposed comparator does not have identical terms to the calls acquired by Defendants. As with the prices obtained by Plaintiff for open market put transactions, this single reported ask price reflects the pricing of a stand-alone call option offered on the open market; it is not pricing for a call sold together with a corresponding put option. And, again, Plaintiff does not plead the volume of options available at the reported pricing.

Having assembled this market data for each of the transactions' legs, Plaintiff compares the reported prices paid by Defendants with the market prices. He observes that the amount that

Defendants were paid for their put options was lower than the market price. At the same time, the exercise price for the call options acquired by Defendants was also lower than the market. His conclusion is that "[i]nstead of demanding the *true* premium value for the Put Options, the Icahn Entities received a discount on the *true* premium value of their Call Options by an amount equal to the premium discount they provided with regard to the writing of the Put Options." *Id.* ¶ 28 (emphasis added).

Plaintiff also asserts that Defendants underpaid for the "time value" of each of the call options that they acquired. To arrive at that conclusion, he first calculates what he terms the "intrinsic" value of each of the call options purchased by subtracting the exercise price from the average reported price of the stock. *Id.* ¶ 29. The difference between the intrinsic value of the option, and the purchase price, he calculates to be the "time value" of the option. *Id.* The time value of the call options acquired by Defendants, he asserts, is $0.02 per share. *Id.* By comparison, the time value of open market stand-alone call options was $1.01. *Id.* Ignoring the fact that the structure of the integrated puts and calls allowed the Defendants to cancel their puts and calls at any time, Plaintiff concludes that "[g]iven that the options did not expire for three months and the underlying price volatility of the Common Stock, the reported purchase price is not reflective of the economic reality of the transaction and would not be the *true* price achieved through arm's-length negotiations." *Id.* (emphasis added).

Here are some things that Plaintiff does not allege. Plaintiff does not allege that Defendants received any income from the transaction other than the $0.01 per share premium. The "value" that he seeks to characterize as a "premium received," and thereby capture as a "profit" is a discount on the purchase price for common stock upon exercise of the call. Plaintiff also does not allege that Defendants acted in bad faith. No facts are pleaded that suggest that the actual agreements entered into by the Defendants were other than arm's-length transactions with the counterparties. As noted

above, Plaintiff alleges in a conclusory manner that the prices Defendants reported with respect to the transactions would not be the "true" price achieved through arm's-length negotiations. That assertion rests solely on Plaintiff's theoretical deconstruction of Defendants' transactions, however. No other facts are pleaded to support that conclusion.

At the end of his analysis of Defendants' trades, Plaintiff seeks to recover as short-swing profits the "deductions or offsets received by them with respect to payments made for Call Options." *Id.* ¶ 32. He asserts that the premium received by the Defendants for writing the put options "did not reflect the true economic value of those transactions," and, therefore asks that the discount that he calculates the Defendants received with respect to the call options be recharacterized as "premium" and be disgorged as short-swing profits.

Let's recap the analytical steps required in Plaintiff's theory to establish liability. There are a number of assumptions implicit in his theory, which, in his view, lead Plaintiff to be able to uncover the "economic reality" of Defendants' transactions:

1. *Assume that Defendants bought stand-alone puts and calls separately, rather than puts with corresponding calls in integrated "put and call agreements."*

   Plaintiff separates Defendants' integrated put and call agreements into two independent, separately priced legs.

2. *Assume that the pricing of stand-alone puts and calls is the same as that for puts sold with corresponding calls, in which the exercise of either cancels the other.*

   Plaintiff asks that we assume that the pricing of an integrated instrument in which the holder can control the timing of cancellation of the options, and, thereby, the duration of exposure to market fluctuations, will parallel the pricing for stand-alone options for which the writer cannot control the timing of exercise during their term. Plaintiff suggests that we must ignore the fact that, unlike the holder of stand-alone puts and calls, the Defendants were not exposed to market fluctuations for the full term of the puts and calls, but rather for as long as they liked. (In fact, Defendants exercised the calls approximately two weeks after their acquisition.) *Id.* ¶ 23.

3. *Assume that the open market prices available to Plaintiff are equivalent to the pricing available to Defendants over-the-counter.*

   Plaintiff acknowledges that the quotes that he obtained do not have identical terms to the

trades that he examined. He also asks that we assume that Mr. Icahn and Defendants acquiring, in the case of Herbalife, a block of 3,230,606 shares, cannot reasonably be expected to obtain better (or even different) pricing over-the-counter than Plaintiff finds on a CBOE screen. We must also assume that a sufficient number of options were available to complete the Defendants' trades at the open market prices that Plaintiff identified, and that volume would not affect pricing.

4. *Assume that the Defendants' financial incentives are the same as an open market trader in stand-alone options.*

Plaintiff asserts that Defendants were paid less for their puts than a financial player selling puts on the open market, and, therefore, that the amount Defendants were paid for the put was not the "true" premium. He asks us to assume that the financial incentives of a presumably long, 10% holder of a security are the same as those of any other market participant. In other words, Plaintiff's premise is that a person who wants to buy something already (and owns a lot of it) should not be more willing to buy it (and, thus, to charge less to write a put forcing them to buy it) than a pure financial player. We must also ignore the possibility that Defendants may have an intrinsic valuation of the security not driven by the day's market price.

5. *Assume the accuracy of Plaintiff's valuation model and math.*

These assumptions, which hypothesize an alternative transaction and strip aside a number of basic economic concepts, reveal to Plaintiff what he terms the "economic reality" of the transaction. They allow him then to posit what he terms the put options' "true premium value"—namely, $0.01 *plus* "the amount equal to the premium discount" with respect to the call options. *Id.* ¶ 28. This takes us to Plaintiff's final assumption.

6. *Assume that "value" obtained is the same as profit.*

Plaintiff seeks to recover his hypothesized discount in the purchase price of shares upon exercise of the call, as a short-swing "profit." As noted, the complaints do not allege that Defendants received any income other than the $0.01 premium paid. They were paid $0.01 for the put options, and paid a large amount upon exercise of the call options. Plaintiff asks us to accept that a party makes a profit whenever they obtain the right to acquire an asset at a discount (based on the market price of the security on a specific date)—even before that asset is sold and the party yields the difference between the purchase price and the price of sale.

The chain of counterfactual hypotheses, assumptions, and inferences that form the basis of Plaintiff's claim is a bridge too far to establish that Defendants must disgorge more in profits than they already have—maybe five or six bridges too far.

### B. Procedural History

Plaintiff, proceeding *pro se*, commenced the first action in this trilogy on February 6, 2015. *Olagues v. Icahn, et al.*, No. 15-cv-898, Dkt. No. 1. In that complaint, Plaintiff named as defendants the various Icahn entities as well as Herbalife, Nuance Communications, and Hologic, Inc. *Id.* After retaining counsel, Plaintiff filed an amended complaint on February 27, 2015, this time naming the Icahn entities and Herbalife, Ltd. as defendants. Dkt. No. 2. On May 7, 2015, the parties entered into a stipulation for Plaintiff to amend his complaint once again. Dkt. No. 20. And on May 8, 2015, Plaintiff filed his Second Amended Complaint against the Icahn Entities, this time omitting issuers from the caption. Dkt. No. 21 (*i.e.*, the Herbalife Complaint).

Approximately one month earlier, Plaintiff filed a separate complaint against the Defendants and Hologic, Inc. *Olagues v. Icahn, et al.*, No. 15-cv-2476, Dkt. No. 1 (S.D.N.Y. Apr. 1, 2015). On the same day, Plaintiff also commenced a separate action against Defendants and Nuance Communications, Inc. *Olagues v. Icahn, et al.*, No. 15-cv-2478, Dkt. No. 1 (S.D.N.Y. Apr. 1, 2015). On May 6, 2015, Plaintiff filed a notice of voluntary dismissal as against Hologic, Inc. No. 15-cv-2476, Dkt. No. 19. On May 27, 2015, the parties entered into a stipulation of dismissal as against Nuance Communications, Inc. No. 15-cv-2478, Dkt. No. 24.

On July 21, 2015, Defendants filed a motion to dismiss all three complaints and an omnibus memorandum of law addressing the allegations in the three actions. *See, e.g.*, No. 15-cv-2476, Dkt. No. 30. On August 20, 2015, Plaintiff filed three separate oppositions to Defendants' omnibus motion to dismiss, each referencing the specific transactions at issue in each action but relying on identical arguments and legal authority. No. 15-cv-2476, Dkt. No. 34 ("Pl.'s Opp'n"); No. 15-cv-2478, Dkt. No. 35; No. 15-cv-898, Dkt. No. 37. Defendants addressed the arguments in these three oppositions in a single omnibus reply. *See, e.g.*, No. 15-cv-2476, Dkt. No. 35 ("Defs.' Reply").

## II.    Legal Standard

"Although on a motion to dismiss a court must accept all factual allegations as true and draw all inferences in the plaintiff's favor, dismissal is appropriate if the plaintiff can prove no set of facts that would entitle him to relief." *Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002) (citations omitted).  Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), plaintiffs must allege in their complaint facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this plausibility standard, plaintiffs must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Id.*

Legal conclusions need not be accepted as true, thus "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  To avoid dismissal, plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## III.    Discussion

### A.  Section 16 in General

Plaintiff alleges that Defendants are liable under the "short-swing profits" rule set forth in Section 16 of the Exchange Act.  Section 16 seeks to "prevent[ ] the unfair use of information which

may have been obtained" by statutory insiders of a company by requiring that any short-swing

profits—that is, profits from purchases and sales of the company's equity securities taking place

within six months of each other—be forfeited to the company. 15 U.S.C. § 78p(b); *see also*

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) ("Section 16(b) of the

Exchange Act seeks to deter 'insiders,' who are presumed to possess material information about the

issuer, from using such information as a basis for purchasing or selling the issuer's equity securities

at an advantage over persons with whom they trade.").

    The statute applies to directors, officers, and "[e]very person who is directly or indirectly the

beneficial owner of more than 10 percent of any class of any equity security" of the issuer (a "10%

owner"). 15 U.S.C. § 78p(a). Section 16(a) imposes certain reporting obligations on these insiders.

Section 16(b) provides in relevant part that

> any profit realized by [such insider] from any purchase and sale, or any sale and
> purchase, of any equity security of such issuer (other than an exempted security) . . .
> within any period of less than six months, . . . shall inure to and be recoverable by
> the issuer, irrespective of any intention on the part of such [insider] in entering into
> such transaction of holding the security . . . purchased or of not repurchasing the
> security . . . sold for a period exceeding six months.

15 U.S.C. § 78p(b). A suit to recover such profits may be maintained by the company or derivatively

by a shareholder. *Id.*

    Courts have described Section 16(b) as a "blunt instrument." *Magma Power Co. v. Dow Chem.*

*Co.*, 136 F.3d 316, 321 (2d Cir. 1998). "[T]he application of Section 16 is largely mechanical, that is,

independent of the purposes or state of mind of parties to a transaction." *CSX Corp. v. Children's Inv.*

*Fund Mgmt. (UK) LLP*, 654 F.3d 276, 291 (2d Cir. 2011) (citations omitted); *see also Magma Power*,

136 F.3d at 320-21; *Blau v. Lamb*, 363 F.2d 507, 515 (2d Cir. 1966) ("Section 16(b), it should be

emphasized, embodies a rather uncommon regulatory mechanism. . . . [Its] purpose is effectuated by

means of, what has been termed, a 'crude rule of thumb.'") (citations omitted).

14

Indeed, under the plain language of the statute, "[n]o showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement." *Magma Power*, 136 F.3d at 320 (citation omitted). Thus, although an insider could make improper use of inside information to profit through trades taking place six months and one day from each other, the statute applies only to purchases and sales within six months of each other. Conversely, an insider could make trades within less than six months of each other without the benefit of any particular inside knowledge, but would be subject to the statute's requirement to return profits from those trades to the company. This is because, as the Supreme Court noted, "the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972). The Court quoted an earlier decision from the Seventh Circuit, which observed that

> [i]n order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect.

*Id.* (quoting *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970)); *see also Magma Power*, 136 F.3d at 321 ("Congress believed that such a blunt instrument was the only way to control insider trading.").

In light of the arguably "arbitrary and sweeping coverage" of the statute, *Reliance*, 404 U.S. at 422, courts have been consistent in holding that in order for liability to attach, the requirements of the statute must be met—it is not enough for a transaction to fall under the broader category of evils that the statute was meant to curb. As the Second Circuit has held, "even if a transaction is found to present the opportunity for speculative abuse, there can be no liability under Section 16(b) unless the statutory requirements are also met." *Gwozdzinsky*, 156 F.3d at 310 (citation omitted). Thus, "[i]n

short, this statute imposes liability without fault [but only] within its narrowly drawn limits."
*Foremost–McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976). *Cf. id.* at 252 ("It is inappropriate to reach the harsh result of imposing § 16(b)'s liability without fault on the basis of unclear language. If Congress wishes to impose such liability, we must assume it will do so expressly or by unmistakable inference.").

As the Second Circuit has summarized, "liability under Section 16(b) does not attach unless the plaintiff proves that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Chechele v. Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky*, 156 F.3d at 308). In this case, there is no dispute that Defendants were 10% owners, and that the transactions at issue yielded short-swing profits under Section 16(b); Defendants concede that they were and have reimbursed the profits that they and the issuers calculate to be due.[5] The question before the Court is what the correct measure of the "short-swing profit" to be disgorged should be with respect to the type of derivative securities at issue here.

### B. Section 16(b) and Derivative Securities

In 1991, the SEC amended its regulations in response to the "proliferation of derivative securities and the popularity of exchange traded options," and the "uncertainty surrounding the application of Section 16" to these types of securities. Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34–28869, Investment Company Act Release No. 35–25254, 56 Fed. Reg. 7242–01, 7248 (Feb. 21, 1991) ("1991 Report"). A derivative security is a "financial instrument that derive[s its] value (hence the name) from an

---

[5] In their memorandum of law, Defendants suggest alternative grounds for dismissal, including that Defendants did not meet the criteria for statutory insiders under Section 16(b). Defs.' Br. at 3 n.2. Because the alternative grounds for dismissal were not fully briefed in Defendants' motion, the Court will not consider them here.

underlying security or index." *Magma Power*, 136 F.3d at 321.  The amendments to the regulations were based on the SEC's conclusion that "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of section 16, since the value of the derivative securities is a function of or related to the value of the underlying equity security."  1991 Report at 7248.  Accordingly, transactions involving derivative securities could be equated to purchases and sales of the underlying securities for purposes of incurring liability under Section 16(b).  The put and call options at issue in this case are derivative securities for purposes of the rule.

The SEC's 1991 regulations of derivatives are based on examining the actual financial consequences of purchasing or selling particular options.  Under the SEC's amended regulations, "[u]pon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act."  Rule 16b–6(d).

In the 1991 regulations, the SEC established rules to calculate the amount of short-swing profits yielded by covered derivative transactions.  In so doing, the SEC was motivated by "a strong desire to avoid the 'battle of the experts' in every case."  *Segen v. Westcliff Capital Management, LLC*, 299 F. Supp. 2d 262, 270 (S.D.N.Y. 2004).  The SEC said as much in its proposing release for Rule 16b–6:

> Substantial progress has been made in the valuation of options and derivative instruments, and techniques such as the Black–Scholes option valuation formula and its progeny are now widely used by traders in the marketplace. . . .  The Commission recognizes, however, that the interests of precision must be balanced against the costs of computation.  *The interests of justice and Congress' purpose in adopting Section 16(b) will not be served by turning every case involving derivative instruments into a battle of experts over competing models of option valuation.*  Accordingly, the Commission seeks to provide certain benchmarks or rules of thumb to be applied in short-swing transactions involving derivative securities.

SEC Release No. 34–26333, 53 Fed. Reg. 49997, 5009 (Dec. 13, 1988) (emphasis added) (footnotes omitted).

The 1991 regulations cap the profit subject to recovery from the cancellation of a put option within six months after its issuance. As noted above, under Rule 16b-6(d) "[u]pon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act. *The profit shall not exceed the premium received for writing the option.*" Rule 16b–6(d) (emphasis added). In other words, "[u]nder this provision, if an insider writes an option that expires unexercised within six months and profits from doing so on account of having been paid by the purchaser for a right to buy shares that the purchaser did not exercise, the writer will be held liable under section 16(b) *for the amount the purchaser paid him or her for the option.*" *Allaire Corp. v. Okumus*, 433 F.3d 248, 252-53 (2d Cir. 2006) (citing *Gwozdzinsky*, 156 F.3d at 309) (emphasis added). "This rule is designed to prevent a scheme whereby an insider with inside information favorable to the issuer writes a[n] . . . option, and receives a premium for doing so, knowing, by virtue of his inside information, that the option will not be exercised within six months." *Gwozdzinsky*, 156 F.3d at 309.

### C. Plaintiff Cannot Artificially Recast Defendants' Transactions

As outlined above, Plaintiff's theory rests on the fragmentation of Defendants' transaction into two hypothetical separate transactions, and the subsequent revaluation of those component parts. That is unsteady ground. Courts have long cautioned against "recast[ing] the actual transaction into [plaintiff's] hypothetical one in order to create liability under § 16(b)." *Portnoy v. Memorex Corp.*, 667 F.2d 1281, 1283 (9th Cir. 1982). In particular, courts have rejected plaintiffs' attempts "to fragmentize" transactions into their component parts in order to establish liability under Section 16(b). *Schur v. Salzman*, 365 F. Supp. 725, 730 (S.D.N.Y 1973). "To probe into the component parts of the price received by or paid to an insider would detract from the objective test in appraising transactions . . . ." *Id.* at 731; *see also Freedman v. Barrow*, 427 F. Supp. 1129, 1152

18

(S.D.N.Y. 1976) (rejecting a "strained attempt to carve up a single . . . transaction by calling it
something which it is not" for the purpose of Section 16(b) liability)).

Here, Plaintiff's "conceptual theorizing seeks to displace the reality of events." *Colan v. Cont'l
Telecom, Inc.*, 616 F. Supp. 1521, 1526 (S.D.N.Y. 1985), *aff'd sub nom. Colan v. Cont. Telecom Inc.*, 788
F.2d 2 (2d Cir. 1986). As described above, Plaintiff's theory rests on the conceptual premise that
that integrated puts and corresponding calls—the exercise of each of which by the common holder
cancels the other—should have the same pricing as two separate transactions representing its
component parts divided into separate legs. Plaintiff's theory proceeds from that premise with the
series of implicit assumptions outlined above. Those assumptions, however, do not model
economic reality; instead they eliminate variables that profoundly affect the economic reality of the
transactions—such as differences in time exposure, and, therefore, market risk, differences in pricing
mechanisms and opportunities, and differences in financial interests of market players. Plaintiff's
theory that "economic reality" is best arrived at through the application of such flawed assumptions
is not sound. The Court concludes that here, as in *Colan*, Plaintiff's "ipse dixit claim is a quantum
leap that disregards the factual attendant circumstances that led to the execution of the"
transactions. *Id.*

Plaintiff asserts that the $0.01 premium price was "a contrivance" and "did not reflect the
true value of the consideration obtained by the Icahn Entities." Herbalife Compl. ¶ 31. Even if the
premium amount was an intentional contrivance, however, it would not enlarge Defendants' liability
beyond the $0.01 per share premium already disgorged. For it is well established that "[l]iability
cannot be imposed simply because the investor structured his transaction with the intent of avoiding
liability under § 16(b)." *Reliance*, 404 U.S. at 422. "Section 16(b) operates mechanically, and makes
no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders
who skirt the letter of the prohibition." *Magma Power*, 136 F.3d at 320-21; *see also CSX Corp.*, 654

F.3d at 291 (2d Cir. 2011); *Donoghue v. Murdock*, No. 13 CIV. 1224 PAE, 2013 WL 4007565, at *4

(S.D.N.Y. Aug. 6, 2013). "That the sequence of events may have been deliberately designed is of no

consequence. There is nothing improper or illegal in seeking to avoid the impact of Section 16(b)."

*Lewis v. Bradley*, 599 F. Supp. 327, 330 (S.D.N.Y. 1984) (citations omitted). Anything short of this

mechanical application would inevitably result in a "judicial search for the will-o'-the-wisp of an

investors' 'intent' in each litigated case." *Reliance*, 404 U.S 425. The Court does not accept Plaintiff's

premise that the transactions can be reframed and repriced, revealing that Defendants intentionally

structured the integrated agreements to sidestep the full extent of their liability under Section 16(b).

But even if so, that would not make Defendants liable. "Such is the price of easy administration."

*Magma Power*, 136 F.3d at 321 (internal quotation marks and citations omitted).

The cases Plaintiff cites in support of his position are inapposite. First, they predate the

1991 amendments, and, therefore, do not address the SEC's limitation of profit in the context of a

cancelled put to the "premium received." Second, and more significantly, each of the cases assess

the proper treatment of elements of an *actual* transaction; they do not begin, as Plaintiff does here,

by reconfiguring the actual transaction into hypothetical alternative transactions.

For example, Plaintiff cites the Seventh Circuit's decision in *Bershad v. McDonough* for the

proposition that it is the "commercial substance of the transaction rather than its form [that] must

be considered." 428 F.2d 693, 697 (7th Cir. 1970). Plaintiff's reliance on this case, like several

others cited, is misplaced, because the first step in Plaintiff's analysis—the hypothetical

deconstruction of Defendants' actual transactions into two separate, independent legs—transfigures

the commercial substance of Defendants' transactions. While courts, like the court in *Bershad*, have

allowed plaintiffs to explore whether the elements of an actual transaction are properly

characterized, they do so by reference to the commercial substance of the actual transaction; they do

not support the proposition that liability can be established through the analysis of a hypothetical alternative transaction, which is where Plaintiff begins.

Similarly, in *Reece Corporation v. Walco National Corporation* the court questioned whether two separate sales should be treated as one for the purpose of Section 16(b) liability. 565 F. Supp. 158, 162-63 (S.D.N.Y. 1981). The court answered that question in the affirmative, having determined that "[a]lthough there was no express legal tie between the two phases, the transaction was structured with the expectation that one would not be carried out without the other." *Id.* at 162. The court concluded that any "attempt to divide it into two 'sales' was wholly artificial and contrived." *Id.* While Plaintiff cites this decision to support his position, it is his approach that artificially divides Defendants' transactions.

Similarly, Plaintiff points to *Herrmann v. Steinberg*, in which Plaintiff notes that the Second Circuit looked to the substance of the agreement because it "had an appearance of artificiality," Herbalife Opposition at 12 (citations omitted). In that case, the target of a hostile tender offer sought to neutralize the offer, in part by purchasing the suitor's outstanding holdings in the company. 812 F.2d 63, 66 (2d Cir. 1987). The target also paid the suitor $28 million dollars as an "expense reimbursement." *Id.* Commenting that labelling the $28 million payment as an expense reimbursement (as opposed to greenmail) "has an appearance of artificiality," the Second Circuit remanded the case to the district court to determine whether to attribute a portion of the $28 million payment to the purchase price of the suitor's shares. *Id.* In doing so, the court observed that "it would be simplistic to divorce the abandoned tender offer completely from [the target's] purchase of [the suitor's] holdings . . . ." *Id.* The Second Circuit did not, however, suggest that the district court must deconstruct the economics of the transaction as a whole to arrive at the correct measure of profits under Rule 16b—rather, merely that it examine the characterization of an actual payment made in the context of an integrated transaction. In these cases, it is the Plaintiff who simplistically

divorces elements of Defendants' actual transactions—by hypothetically separating them into two separate legs with characteristics that deviate significantly from the economic substance of the actual transactions.

Remember that "the application of Section 16 is largely mechanical, that is, independent of the purposes or state of mind of parties to a transaction." *CSX Corp.*, 654 F.3d at 291. The objective focus of Rule 16(b) is not promoted by Plaintiff's theory—which posits that liability should rest on "economic reality" determined by him through reference to alternative hypothesized transactions. Acceptance of Plaintiff's approach would, instead, engender in every case the kind of "battle of the experts" that the SEC sought to avoid when it promulgated the 1991 regulations. *Segen*, 299 F. Supp. 2d at 270.

### D. The Premium Received Does not Include the Value of Discounted Calls

Even accepting the validity and accuracy of Plaintiff's proposed reconfiguration of Defendants' transactions, the "deductions" on the call price that he would add to the put premium is not a "profit." As described above, in the 1991 regulations the SEC established a concrete measurement of the profit obtained upon cancellation of a put option: "*The profit shall not exceed the premium received for writing the option.*" Rule 16b-6(d). The SEC did not define "premium" in its release, but the Second Circuit has since described it as "*the amount the purchaser paid him or her for the option.*" *Allaire Corp.*, 433 F.3d at 252-53 (citing *Gwozdzinsky*, 156 F.3d at 309) (emphasis added). This description is consistent with the common understanding of the term "premium." *See, e.g.*, BLACK'S LAW DICTIONARY 1371 (Bryan Garner, et al., eds., 10th ed. 2014) (defining "premium" as the "amount paid at designated intervals for insurance . . . .").

Recognizing that no amount was paid to Defendants other than the $0.01 per share, Plaintiff attempts to reframe the rule to require reimbursement of "premium consideration obtained," instead of premium received. Herbalife Comp. ¶ 30. He calculates that premium consideration obtained to

include the amount of the discounted exercise price on the call options. Plaintiff points to no precedent that supports his interpretation of the rule. The Court finds no reason to reconstruct the language of Rule 16b-6(d) to make it more expansive than the SEC expressly provided.

More importantly, Plaintiff's position that the hypothesized bargain on the call option should be treated as a profit is simply illogical. A "profit" is the "excess of revenues over expenditures in a business transaction." BLACK'S LAW DICTIONARY 1404. Assuming that Defendants obtained the right to exercise call options at a discount, then exercised the call right at that discounted price, they would not obtain a profit until they sold the asset, yielding revenues in excess of their expenditures. Here, Defendants made expenditures to purchase shares upon exercise of the call options, and they received the $0.01 per share premium for writing the put options. Plaintiff does not allege that Defendants realized any revenue with respect to the call options in excess of their expenditures within the 6 month window for short-swing liability—the only revenue that they received was the $0.01 per share premium, which Rule 16b-6(d) defines as profit.

Plaintiff mistakes "value" for profit. For even if Defendants obtained "value" through a discounted premium price, unrealized value is not a profit. Profit from the discount comes, if ever, when the securities are sold at a gain. You don't have a profit if you buy a share of IBM at the market price *less* two dollars, even if you have $2 of value. You have a profit when you then sell the cheap stock at the market price. Plaintiff ignores the fact that if the value of the security went down after the Defendants received the "discounted" right to buy shares, instead of up, the "value" of his hypothesized discount would disappear. Plaintiff's artificially freezes the "value" of the discount on a single day, which helps him enhance his theorized recovery, but ignores the fact that the value of that discount will change with a fluctuating market. In short, unrealized "value" is not a synonym for profit—but Plaintiff's theory rests on that assumption.

### E. Defendants' Actual Transactions Do Not Have Indicia of Speculative Abuse

Finally, the Court does not see a basis to conclude that the *actual* transaction that Defendants engaged in bears indicia of speculative abuse that are not remedied by reimbursement of the $0.01 per share premium.[6] This decision has focused to this point on the flaws in Plaintiff's hypothetical reframing of Defendants' transactions because that is the basis for Plaintiff's claims. But, even though Defendants' transaction is not "unorthodox," it is worthwhile to touch briefly on the question whether the actual transaction entered into by Defendants lend themselves to speculative abuse that should be addressed through an expansive reading of Rule 16b-6(d).

"The two primary 'indices' used for measuring the potential for speculative abuse are (1) the defendant's access to inside information (as distinguished from possession of it), and (2) the defendant's ability to influence the timing and circumstances of the transaction at issue." *Donoghue v. Casual Male Retail Grp., Inc.*, 375 F. Supp. 2d 226, 231-32 (S.D.N.Y. 2005) (citations omitted). Plaintiff maintains that "the possibility of speculative abuse is apparent" from this structure because "Defendants could have written the Put Options and taken in the premiums with knowledge from insider information that the Put Options would never be exercised and that they would get to keep the premiums upon the expiration of the Put Options." Herbalife Opposition at 16. That, of

---

[6] The Court recognizes that Defendants' transactions are not "unorthodox;" they fall within the four corners of Rule 16b-6(d). Courts will scrutinize "borderline" or "unorthodox" transactions by asking "'whether they serve as a 'vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based on access to inside information.'" *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 218 (2d Cir. 2012) (quoting *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593-94 & n. 26); *see also Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 126 (2d Cir. 2002) (applying the *Kern County* analysis and determining that no possibility of speculative abuse of inside information existed with respect to the transactions at issue). This "pragmatic' approach to §16(b)," the Supreme Court reasoned, "will best serve the statutory goals." *Kern Cnty.*, 411 U.S. at 595 n.26. It is only when analyzing financial instruments that fall within this category that courts may look beyond the agreement's terms and "ask[] whether the particular type of transaction involved is one that gives rise to speculative abuse." *Kern*, 411 U.S. at 595 (internal quotation marks and citations omitted); *see also DiLorenzo v. Murphy*, 443 F.3d 224, 227-28 (2d Cir. 2006) (quoting *Kern*, 411 U.S. at 595).

course, is true; Plaintiff is merely paraphrasing the purpose of Rule 16b-6(d) as described by the Second Circuit in *Gwozdzinsky*, 156 F.3d at 309.

What is missing, however, is any argument explaining how any element of Defendants' transaction—beyond receipt of the $0.01 per share premium—shows indicia of speculative abuse within the 6 month short-swing window. Even without taking judicial notice of the asserted fact that the transactions were "Delta One" transactions, the basic structure of the transactions described in the complaints show that Defendants were long the security—they were committed to buy with the put, and obtained the right to buy through the call. Thus, the Defendants' transactions were not structured to obtain a "quick [in-and-out] profit" through "'short swing speculation' by company insiders." *Gibbons v. Malone*, 801 F. Supp. 2d 243, 246 (S.D.N.Y. 2011), *aff'd*, 703 F.3d 595 (2d Cir. 2013). Rather, the transactions were structured as "in and in"—both legs were designed to allow Defendants to acquire more stock. Defendants did acquire that stock; there is no allegation that they sold it for a profit within the short-swing profit window. Plaintiff accurately identifies the one element raising the prospect of speculative abuse—the payment of the premium, which Defendants disgorged. He does not provide a justification for treating any other element of the transaction as "profit" that should increase that amount.

Simply put, apart from the rationale for disgorging the $0.01 per share premium, "conspicuously absent from [Plaintiff's] arguments . . . is an explanation of how the challenged transactions herein give rise to speculative abuse or constitute short-swing speculation by insiders . . . ." *Rosen v. Drisler*, 421 F. Supp. 1282, 1286 (S.D.N.Y. 1976); *see also Donoghue v. Patterson Cos., Inc.*, 990 F. Supp. 2d 421, 426 (S.D.N.Y. 2013) (dismissing a shareholder action alleging Section 16(b) violations and reasoning that plaintiff's argument that "there is a *potential* for misuse of insider information" was based on a misunderstanding of the transaction at issue). The exercise price for the call options was fixed at the time the transactions were executed (and, in fact, no called shares

were sold during the short-swing window).  As Second Circuit did in *Gwozdzinsky*, the Court rejects Plaintiff's "attempt to bring this transaction within the ambit of Section 16 by invoking the policy argument that it is the type of speculative, short-term profit-taking the statute was designed to prevent.  This 'policy argument' turns case law on its head.  The statute, as written, establishes strict liability for all transactions that meet its mechanical requirements.  When courts have looked to policy, it was to avoid the sometimes harsh results of this inflexible rule." *Gwozdzinsky*, 156 F.3d at 310.

## IV.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss are granted in all three actions with prejudice.  The dismissal is without leave to replead the claims, because any attempt to replead the claims on the theoretical basis asserted by Plaintiff would be futile.  *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (noting that leave to amend need not be granted where the proposed amendment would be futile).

The Clerk of Court is directed to terminate the motions pending at Dkt. No. 30 (1:15-cv-2476), Dkt. No. 31 (1:15-cv-2478), Dkt. No. 33 (1:15-cv-898), and to close each of those cases.

SO ORDERED.

Dated:  March 23, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge

# Exhibit 14

ORIGINAL



FILED

JAN 1 2 2007

KIM TURNER
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: C. Lucchesi, Deputy

1  PATRICK K. FAULKNER, COUNTY COUNSEL
2  STEPHEN R. RAAB, Deputy (SBN 180939)
   Room 303, Civic Center
   San Rafael, CA 94903
3  Tel.: (415) 499-6117, Fax: (415) 499-3796

4

5  Attorney(s) for Defendants Leon Kousharian and Patricia Stafford

6

7

8            SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN

9

10  JOHN OLAGUES,                          Case No. CV 063488

11           Plaintiff,                    [PROPOSED] ORDER RE: (1): DEFENDANTS'
                                           DEMURRER AND (2) DEFENDANTS'
12  v.                                     MOTION FOR DETERMINATION THAT
                                           PLAINTIFF IS A VEXATIOUS LITIGANT,
13  LEON KOUSHARIAN; PATRICIA STAFFORD;    ORDER REQUIRING SECURITY AND PRE-
    and DOES 1 through 10;                 FILING ORDER
14
                                           Date:      January 12, 2006
15           Defendants.                   Time:      9:00 a.m.
                                           Courtroom: H
16                                         Judge:     Hon. John A. Sutro, Jr.

17

18      Defendants LEON KOUSHARIAN and PATRICIA STAFFORD's Demurrer to Complainant

19  JOHN OLAGUES' Complaint and Defendants' Motion for Determination that Plaintiff is a Vexatious

20  Litigant came on regularly for hearing on January 12, 2007 in Department H of this Court. Stephen R.

21  Raab appeared for Defendants KOUSHARIAN AND STAFFORD and JOHN OLAGUES appeared IN

22  PRO PER.

23      The Court, having considered the papers and pleadings on file herein and the oral argument of

24  the parties, and good cause appearing therefor, HEREBY ORDERS as follows:

25      Defendants Motion to Declare Plaintiff as a Vexatious Litigant is Granted, Code Civ. Proc. §

26  391(b). Within the last three and one-half years, plaintiff has filed six civil actions against one or both

27  of these defendants based on the same facts and seeking the same relief, which actions all have been

28



EXHIBIT G-2



1
NOTICE OF HEARING ON DEMURRER; DEMURRER OF DEFENDANTS LEON KOUSHARIAN AND
PATRICIA STAFFORD; POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

1 | finally determined adversely to him. (See Code Civ. Proc. §391(b)(1) and (2); *Tokerud v. Capitolbank*

2 | *Sacramento* (1995 38 Cal.App. 4th 775, 779.)

3 |     ·Pursuant to Code Civ. Proc §391.1, there is no reasonable probability that plaintiff will prevail in

4 | this action, and the Court orders plaintiff to post security in the amount of $7,0000 as a condition to

5 | continuing this action. Plaintiff has 15 days from the date of this order to file suitable security with this

6 | Court. Failure to do so within the time provided will result in a dismissal of this action in favor of

7 | defendants. (Code Civ. Proc. § 391.4.)

8 |     This Court also grants defendants' Motion for a Prefiling Order, Pursuant to Code Civ. Proc.

9 | §391.7. Under that order, plaintiff is prevented from filing any new litigation in the courts of this state

10 | in propria persona without first obtaining leave of the presiding judge of the court where the litigation is

11 | proposed to be filed. (Code Civ. Proc. § 391.7(a).)

12 |     In light of this Court's orders, defendants' Demurrer is continued until such time as plaintiff

13 | posts the required security. Defendants may file a reply to Plaintiff's Opposition to the Demurrer at

14 | least five court days before the hearing date for the Demurrer.

15 |     Defendants' request to take judicial notice of the court files in this action, the court files in the

16 | federal actions and the Louisiana State actions, and the government tort claim filed by plaintiff, is

17 | granted. (Ev. Code § 452(c), (d).)

19 | DATED:  *1·12·07*

21 |                                         _____

22 |                     JUDGE OF THE SUPERIOR COURT

24 | APPROVED AS TO FORM:

26 | DATED:

                                    _____

                        JOHN OLAGUES

NOTICE OF HEARING ON DEMURRER; DEMURRER OF DEFENDANTS LEON KOUSHARIAN AND
PATRICIA STAFFORD; POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

# Exhibit 15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN OLAGUES                                    CIVIL ACTION

VERSUS                                          NO: 09-3092

STEVEN KLIEN ET AL.                             SECTION: "S" (1)

## ORDER

     **IT IS HEREBY ORDERED** that the "Rule 12(b) Motion to Dismiss" is **GRANTED**

and the case is **DISMISSED WITH PREJUDICE** as frivolous.  <u>See</u> No. 07-4486).  (Document

#5.)  **IT IS FURTHER ORDERED** that all claims alleged by John Olagues are **DISMISSED**

**WITH PREJUDICE**.

     **IT IS FURTHER ORDERED** that the defendants' "Motion for Sanctions under 42

U.S.C. § 1988" in the form of attorney's fees is **DENIED**.  (Document #5.)

     **IT IS FURTHER ORDERED** that John Olagues's motion for sanctions is **DENIED**.

(Document #10.)

     In view of the admonishment in Docket No. 07-4486 and Olagues' continued abuse of

the judicial system, the court imposes the following sanction:

     **IT IS HEREBY ORDERED** that Olagues shall not file any further lawsuits in the

United States District Court for the Eastern District of Louisiana related to the subject matter in the previously-filed frivolous and duplicative suits without first obtaining the permission of a judge of this court to file the lawsuit.  Failure to comply with this order will result in the imposition of monetary sanctions.

New Orleans, Louisiana, this   28th day of September, 2009.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

2

# Exhibit 16

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOHN OLAGUES** | **CIVIL ACTION** |
| **VERSUS** | **NO: 12-2647** |
| **JIM LETTEN, UNITED STATES ATTORNEY, ET AL.** | **SECTION: "S" (1)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that this case is **DISMISSED.**

On November 16, 2009, this court entered an order in <u>John Olagues v. Steven Klien</u>, Civil Action No. 09-3092 that stated that "Olagues shall not file any further pleadings in the United States District Court for the Eastern District of Louisiana without first obtaining the permission of a judge of this court to file the pleading." Olagues originally filed Civil Action No. 12-2647 in the Twenty-Fourth Judicial District Court, Parish of Jefferson, State of Louisiana. Defendant, Jim Letten, United States Attorney removed the suit to the United States District Court for the Eastern District of Louisiana. As a result, Olagues has effectively attempted to circumvent this court's November 16, 2009, Order requiring him to obtain the permission of a judge of United States District Court for the Eastern District of Louisiana to pursue litigation in this court. Olagues has not obtained permission from a judge of this court to proceed in Civil Action No. 12-2647. Therefore, the action is DISMISSED.

New Orleans, Louisiana, this   9th   day of November, 2012.


**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

# Exhibit 17

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/28/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                         :

JOHN OLAGUES,                        :
                                           :

                          Plaintiff,    :            1:14-cv-4872-GHW
                                           :

               -against-                  :            ORDER TO SHOW
                                           :                 CAUSE
JAMES DIMON,                        :

                                           :

                         Defendants. :
                                           :

-------------------------------------------------------------- X

GREGORY H. WOODS, District Judge:

       Plaintiff John Olagues commenced this action *pro se* against defendant James Dimon, the

Chairman and CEO Director of JPMorgan Chase & Co., under Section 16(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78p(b). Mr. Olagues, who identifies himself as owning shares in

JPMorgan Chase & Co., brings this action on behalf of all shareholders of JPMorgan Chase & Co.

In federal court, "an individual generally has the right to proceed *pro se* with respect to his own

claims or claims against him personally." *Berrios v. N.Y.C. Housing Authority*, 564 F.3d 130, 132 (2d

Cir. 2009). However, the right to proceed *pro se* does not permit an individual who is not licensed as

an attorney to appear on behalf of another person or group of people. *United States v. Flaherty*, 540

F.3d 89, 92 (2d Cir. 2008); *see also Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) ("[B]ecause *pro

se* means to appear for one's self, a person may not appear on another person's behalf in the other's

cause."). Accordingly, Mr. Olagues is hereby ORDERED TO SHOW CAUSE by September 19,

2014 as to why this action should not be dismissed for lack of counsel.

       SO ORDERED.

Dated: August 28, 2014
New York, New York               _____
                                             GREGORY H. WOODS
                                         United States District Judge